### ENGINEERED PRODUCTS CO., Plaintiff,

v.

### DONALDSON COMPANY, INC., Defendant.

### No. C 98–2106 MWB.

United States District Court, N.D. Iowa, Eastern Division.

April 13, 2004.

See also 165 F.Supp.2d 836, 225 F.Supp.2d 1069, and 290 F.Supp.2d 974.

Bridget A. Sullivan, Craig J. Lervick, Cyrus A. Morton, Edward M. Laine, Oppenheimer Wolff & Donnelly, Minneapolis, MN, Richard S. Fry, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Plaintiff.

Annamarie A. Daley, Christopher A. Seidl, Christopher J. Sorenson, Robins, Kaplan, Miller & Ciresi, LLP, Stephen J. Holtman, Simmons, Perrine, Albright, Ellwood, Cedar Rapids, IA, for Defendant.

MEMORANDUM OPINION AND OR-
DER REGARDING THE PARTIES'
PRE–TRIAL MOTIONS

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. **INTRODUCTION** ................................................... 957

II. **MOTIONS RELATED TO EPC'S CASE–IN–CHIEF** ......................... 959
 A. *Admissibility Of Evidence Of Equivalents* ............................ 959
 1. *The pending motions* ............................................. 959
 2. *Arguments of the parties* ........................................ 959
 3. *Legal analysis* ................................................. 961
 a. *The Festo decisions* ......................................... 961
 i. *The Supreme Court's decision* ........................... 961
 ii. *The decision on remand* ................................ 963
 b. *The "elongated locking member" and "interengagable
 notches" limitations* ...................................... 965
 i. *Was there a "narrowing" amendment?* ..................... 965
 ii. *Were the narrowing amendments for purposes of
 patentability?* ........................................ 969
 iii. *Can EPC overcome the presumption of "total
 surrender"?* .......................................... 970
 c. *The "disengagement means" limitation* ....................... 975
 i. *Arguments of the parties* .............................. 975
 ii. *The prior rulings* .................................... 975
 iii. *Standards for reconsideration* ........................ 977
 iv. *Does the Festo analysis apply to claim construction?* ....... 973
 v. *Does the prosecution history limit the prior claim
 construction, literal infringement, or doctrine of
 equivalents infringement?* ............................. 982
 B. *Willful Infringement* ............................................ 986
 1. *Arguments of the parties* ........................................ 986
 2. *Analysis* ..................................................... 986

III. **MOTIONS RELATED TO DONALDSON'S DEFENSES** ....................... 987
 A. *Viability Of Donaldson's Double–Patenting Defense* .................. 987
 1. *The pending motions* ............................................. 987
 2. *Arguments of the parties* ........................................ 988
 3. *Analysis* ..................................................... 989
 a. *The court's prior ruling* ..................................... 989
 i. *Summary judgment standards* ........................... 989
 ii. *The first step in analysis of the defense* ................. 990
 iii. *The second step in analysis of the defense* ................ 990
 b. *Effect of the summary judgment ruling* ....................... 992
 i. *Viability of the defense* ............................... 992
 ii. *Impact on the motion for leave to amend* ................. 993
 B. *Patent Misuse* ................................................. 993
 1. *Arguments of the parties* ........................................ 993
 2. *Analysis* ..................................................... 994
 a. *Patent misuse* .............................................. 994
 b. *Propriety of pre-trial determination* ......................... 996
 C. *Separate Patentability* ........................................... 998
 1. *Arguments of the parties* ........................................ 998
 2. *Analysis* ..................................................... 999
 a. *Separate patentability* ....................................... 999
 b. *Relevance to literal infringement* ........................... 1001

 c. Relevance of the proffered evidence of separate patentability....1002
 d. Admissibility of the evidence of separate patentability .........1002

IV. EXPERTS .............................................................1003
 A. Miller And Hall ................................................1003
 1. James W. Miller ...........................................1003
 a. Arguments of the parties .............................1003
 b. Analysis .............................................1004
 i. Late disclosure and improper supplementation..............1004
 ii. Patent attorneys as experts ............................1006
 2. Jerry Lee Hall............................................1008
 B. Expert On Lost Profits .........................................1008
 1. Arguments of the parties .................................1008
 2. The "Daubert standard" ..................................1009
 3. Application of the "Daubert standard" ....................1011
 C. Untimely Expert Reports .......................................1011
 1. Arguments of the parties .................................1012
 2. Analysis .................................................1013
 a. Applicable standards .................................1013
 b. Exclusion of Mr. Burton's March 1, 2004, report and
 summary exhibits .................................1014
 c. Exclusion of Dr. Nieberding's evidence .......................1016

V. WAIVER OF PRIVILEGE ...............................................1016
 A. The Pending Motions ............................................1016
 B. Background .....................................................1017
 C. Analysis.......................................................1018
 1. Arguments of the parties .................................1018
 2. Applicable law ...........................................1020
 3. Application of the law ....................................1021

VI. ADMISSIBILITY OF VIDEOTAPE .....................................1023

VII. RELEASE OF SUMMARY JUDGMENT EXHIBITS........................1024

VIII. CONCLUSION ......................................................1024

A plethora of pre-trial motions confronts the court in this patent infringement action. Although the motions are cast in terms of the admissibility of evidence, several of them are in reality motions for determination, as a matter of law, of key issues in the litigation. Consequently, this ruling on "pre-trial" matters addresses issues as involved and contentious as any summary judgment ruling and has at least as much likelihood as any summary judgment ruling to be outcome determinative on some claims and issues.

## I. INTRODUCTION

This patent infringement action between plaintiff Engineered Products Company (EPC) and defendant Donaldson Company (Donaldson) arises from Donaldson's creation and sale of two air filter indicator devices: the Air Alert, sold from 1997 to 1999, and the Next Generation Air Alert (NG Air Alert), sold from 1999 through the present. EPC contends that Donaldson's devices infringe EPC's U.S. Patent Number 4,445,456 (the '456 patent), issued on May 1, 1984, and expired in 2001, for a mechanical air filter restriction indicator with a lock-up feature. Because the court has already described the procedural and factual context to this litigation in some detail in prior published rulings, see Engineered Prods. Co. v. Donaldson Co., Inc., 165 F.Supp.2d 836 (N.D.Iowa 2001) (EPC

*I* ) (decision by former District Judge, now Circuit Judge, Michael Melloy, following a "*Markman* hearing"); *Engineered Prods. Co. v. Donaldson Co., Inc.*, 225 F.Supp.2d 1069 (N.D.Iowa 2002) (*EPC II* ) (ruling by the undersigned on the defendant's motion for summary judgment on defense of invalidity for obviousness-type double patenting); *Engineered Prods. Co. v. Donaldson Co., Inc.*, 290 F.Supp.2d 974 (N.D.Iowa 2003) (*EPC III* ) (ruling by United States Magistrate Judge Paul A. Zoss on the parties' cross-motions regarding plaintiff's counsel's alleged conflict of interest and appearance of impropriety), the court will not reiterate all of that background information here.

However, the court finds that it would be helpful to an understanding of the various discussions of the claimed invention in the '456 patent to include Figures 3 and 4 from the '456 patent, which show the claimed air filter indicating device in infold and outfold positions.

FIG. 3

FIG. 4

The court also finds it helpful to reiterate that the present dispute was prompted, at least in part, by a decision of General Motors (GM) in the mid–1990s to add a progressive air filter restriction indicator to its light truck platform, the GMT–800 platform. This platform includes large passenger vehicles, such as SUVs, and hence, was expected to see enormous growth. EPC and Donaldson, the only domestic manufacturers of progressive air filter restriction indicators, competed for the contract to provide the required indicators. Donaldson eventually updated its product, at considerable expense, to produce the Donaldson Air Alert. Based on that upgraded design, Donaldson was awarded the GMT–800 contract. The Air Alert was manufactured and sold from 1997 to 1999, at which time it was replaced by the NG Air Alert. However, on November 20, 1998, EPC filed the present lawsuit alleging that the Air Alert and NG Air Alert infringe EPC's '456 patent. Trial in this matter is set to begin on April 26, 2004, and will likely last the better part of three weeks.

A total of seventeen pretrial motions are now before the court, some involving overlapping issues, filed over a period of several months. The approach of trial previously scheduled for February 2, 2004,

prompted the filing of the first wave of pre-trial motions. When the trial was continued to April 26, 2004, the court established a briefing schedule on several of those motions to be completed by the end of March. However, a second wave of pre-trial motions was filed on March 26, 2004, one month before the rescheduled trial date. Finally, with the replies to the second wave of motions on March 31, 2004, came a final salvo, yet another motion to exclude expert testimony. The motions fall into the following broad categories: (1) motions relating to EPC's case-in-chief (infringement under the doctrine of equivalents, willful infringement); (2) motions relating to Donaldson's defenses (obviousness-type double patenting, patent misuse, separate patentability); (3) motions relating to experts (qualification, reliability, untimely disclosure); (4) waiver of privilege as to communications to or from EPC's prior patent counsel; (5) admissibility of a videotape on practices and procedures of the Patent and Trademark Office (PTO); and (6) the release of summary judgment exhibits for use at trial. The parties did not request oral arguments on any of the pending motions. Therefore, these matters are now fully submitted.

The court deems it most productive to address, in turn, the *issues* raised by the motions, rather than to address the motions, in turn, in the order in which they were filed. The court will provide further pertinent factual background on these issues, where necessary, in its legal analysis, below.

## II. MOTIONS RELATED TO EPC'S CASE–IN–CHIEF

The motions that the court will address first relate to EPC's case-in-chief. These motions involve the admissibility of evidence of "equivalents" of EPC's patent claims and the admissibility of evidence of willful infringement.

## A. Admissibility Of Evidence Of Equivalents

### 1. The pending motions

One of several contentious issues in this case is the admissibility of evidence of infringement under the "doctrine of equivalents." On January 9, 2004, EPC filed its Motion In Limine To Allow Evidence On Doctrine Of Equivalents (docket no. 251). Much later, on March 1, 2004, Donaldson filed its own Motion In Limine To Exclude Evidence Relating To The Doctrine Of Equivalents And Motion To Modify Claim Construction (docket no. 292). Donaldson resisted EPC's motion on March 2, 2004 (docket no. 295), and expressly relied on that resistance in support of its own motion. EPC resisted Donaldson's motion on March 24, 2004 (docket no. 314). Finally, Donaldson filed a reply in further support of its motion on March 31, 2004 (docket no. 328).

### 2. Arguments of the parties

EPC asserts that it intends to prove "literal" infringement of the '456 patent, at least in the first instance, but that, in the alternative, it may also attempt to prove infringement under the "doctrine of equivalents." EPC points out that this court ruled, in *EPC I*, that EPC has generated genuine issues of material fact on the issue of infringement under the doctrine of equivalents. However, EPC also acknowledges that subsequent rulings by the Supreme Court and the Circuit Court of Appeals for the Federal Circuit require some "revisitation" of the issue of "equivalents" infringement prior to trial. Therefore, EPC states that its motion is intended to avoid any dispute at trial concerning recent case law on the doctrine of prosecution history estoppel. Even in light of this more recent case law, EPC argues that prosecution history estoppel does not apply in this case to bar or limit the "equiva-

lents" upon which it may rely, because no narrowing amendments were made to any relevant claim elements of the '456 patent for a substantial reason related to patentability.

More specifically, EPC contends that, under *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002), the reach of prosecution history estoppel depends upon the subject matter surrendered by a *narrowing* amendment, not merely on "cosmetic" amendments. EPC argues, further, that upon remand in the *Festo* case, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd.,* 344 F.3d 1359 (Fed.Cir.2003), *Cert. denied,* 72 U.S.L.W. 3513, —— U.S. ——, 124 S.Ct. 2018, 2019, 158 L.Ed.2d 492 (2004), the Federal Circuit Court of Appeals "elucidated" the applicable analysis, explaining that no presumption of estoppel arises, unless there is a narrowing amendment made for a substantial reason related to patentability. That decision also holds that a patentee may then rebut a presumption of "total surrender" of equivalents to narrowed claims, if the equivalent in question was unforeseeable at the time of the application, the rationale underlying the amendment bears merely a tangential relation to the equivalent in question, or if the patentee could not have been reasonably expected to describe the insubstantial substitute in question. While EPC acknowledges that there were amendments to the claims of the '456 patent, EPC argues that there is no identifiable "narrowing amendment" made for a "substantial reason related to patentability" to two elements, the "elongated locking member" and the "interengageable notches." Rather, EPC asserts that any amendments were made for "cosmetic" reasons or to encompass a competitor's infringing device. Thus, EPC argues, the *Festo* inquiry ends, and there is no estoppel. However, even if the relevant amendments could be deemed to be "narrowing," EPC argues that it can easily rebut the presumption that prosecution history estoppel applies, because the rationale for the underlying amendments bore only a tangential relation to the equivalent in question in Donaldson's accused infringing device, the NG Air Alert.

EPC also asserts that Donaldson's argument for reconsideration or clarification of the court's construction of the "means for selectively disengaging" element on the basis of *Festo* is without merit. EPC points out that the court has already rejected one request by Donaldson to reconsider the pertinent construction and that Donaldson has not pointed to any new facts, circumstances, or intervening case law that requires a second reconsideration. Specifically, EPC argues that the *Festo* decisions do not change the law of claim construction, and Donaldson has not pointed to anything else requiring a different construction. EPC contends that Donaldson's mistaken reliance on *Festo* arises from confusion of the doctrine of equivalents infringement with literal infringement of a means-plus-function claim, where the latter reaches a product that performs the identical function recited in the claim using the identical *or equivalent* structure as disclosed in the specification for performing that function. EPC also contends that it clarified the language of the specification, at the request of the examiner, without adding any new matter, so that the clarification has no effect on the court's construction. In short, EPC contends that the court's prior construction is complete and correct.

Donaldson takes a different view on both the applicability of prosecution history estoppel in this case and the need to reconsider construction of the means-plus-function claim. Donaldson contends that EPC improperly focuses on just five words in the language of the "locking means"

claim of the '456 patent. However, Donaldson contends that if the claim is examined in its entirety, it is clear that the inventor dramatically narrowed the claim during prosecution of the patent application, as to both the "elongated locking member" limitation and the "interengagable notches" limitation, to the point where the claim reaches no more than the specific structure and structural relationship described and claimed in the final application. Consequently, Donaldson argues, EPC cannot assert infringement under the doctrine of equivalents in this case.

As to the "disengagement means" limitation, Donaldson argues that prosecution history estoppel limits the scope of the *literal* infringement analysis in this case, barring application of the claim to an accused device in a manner that is inconsistent with the inventor's concessions to the patent office. Moreover, Donaldson argues that the *Festo* decisions require reconsideration of the court's claim construction of the "disengagement means" in the '456 patent, because positions taken before the PTO also bar inconsistent positions on claim construction. Here, Donaldson argues that the court's claim construction of the "disengagement means" limitation is broad enough to include the original claims that the inventor abandoned during prosecution of the patent. Therefore, Donaldson contends that the court's claim construction is clearly erroneous and must be modified.

Details of both parties' arguments are best addressed in the court's legal analysis, below.

### 3. Legal analysis

#### a. The Festo decisions

At the center of the parties' arguments concerning claim construction and applicability of the doctrine of equivalents are the decisions of the Supreme Court and the Federal Circuit Court of Appeals in the *Festo* case. Therefore, the court begins its analysis of the doctrine of equivalents and claim construction issues with an examination of the *Festo* decisions. The court will then turn to the question of the impact of those decisions on the present litigation.

***i. The Supreme Court's decision.*** This court recently summarized the Supreme Court's decision in the *Festo* case as follows:

> In *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002), the Supreme Court was required "to address once again the relation between two patent law concepts, the doctrine of equivalents and the rule of prosecution history estoppel." *Festo,* 535 U.S. at 726, 122 S.Ct. 1831. The Court explained the context of, and issues in, its ruling more specifically, as follows:
>
>> In the decision now under review the Court of Appeals for the Federal Circuit held that by narrowing a claim to obtain a patent, the patentee surrenders all equivalents to the amended claim element. Petitioner asserts this holding departs from past precedent in two respects. First, it applies estoppel to every amendment made to satisfy the requirements of the Patent Act and not just to amendments made to avoid pre-emption by an earlier invention, *i.e.,* the prior art. Second, it holds that when estoppel arises, it bars suit against every equivalent to the amended claim element. The Court of Appeals acknowledged that this holding departed from its own cases, which applied a flexible bar when considering what claims of equivalence were estopped by the prosecution history. Petitioner argues that by replacing the flexible bar with a complete bar the Court of Appeals cast doubt on many existing pat-

ents that were amended during the application process when the law, as it then stood, did not apply so rigorous a standard.

We granted certiorari to consider these questions.

*Festo*, 535 U.S. at 726–28, 122 S.Ct. 1831. Thus, it is clear that the Supreme Court's focus in *Festo* was on the nature of amendments to a patent application that will give rise to prosecution history estoppel when a patentholder asserts infringement under the doctrine of equivalents.

More specifically, the Court explained that the role of prosecution history estoppel is to prevent an inventor from using the doctrine of equivalents to "recapture in an infringement action the very subject matter surrendered as a condition of receiving a patent." *Id.* at 734, 122 S.Ct. 1831. With that role in mind, the Court turned to consideration of the question of what kinds of amendments may give rise to estoppel. The Court rejected the petitioner's argument "that estoppel should arise when amendments are intended to narrow the subject matter of the patented invention, for instance, amendments to avoid prior art, but not when the amendments are made to comply with requirements concerning the form of the patent application." *Id.* at 735, 122 S.Ct. 1831. Although the Court acknowledged that "[o]ur 'prior cases have consistently applied prosecution history estoppel only where claims have been amended for a limited set of reasons,' such as 'to avoid the prior art, or otherwise to address a specific concern—such as obviousness—that arguably would have rendered the claimed subject matter unpatentable,'" the Court had "not purport[ed] to define that term or to catalog every reason that might raise an estoppel." *Id.* (quoting *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 30–32, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). "Indeed," the Court explained, "we stated that even if the amendment's purpose were unrelated to patentability, the court might consider whether it was the kind of reason that nonetheless might require resort to the estoppel doctrine." *Id.* (again citing *Warner–Jenkinson*, 520 U.S. at 40–41, 117 S.Ct. 1040). Therefore, the Court "agree[d] with the Court of Appeals that a narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel," including, by way of express example, any requirement of 35 U.S.C. § 112. *Id.* at 736, 122 S.Ct. 1831 (emphasis added). As to § 112 requirements, the Court distinguished between "truly cosmetic" amendments under that provision, which did not narrow the scope of the patent or raise an estoppel, and "a § 112 amendment [that] is necessary and narrows the patent's scope—even if only for the purpose of better description," to which estoppel "may apply." *Id.* at 736–37, 122 S.Ct. 1831.

*Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 299 F.Supp.2d 903, 916–17 (N.D.Iowa 2004) (footnotes omitted).[1]

On remand, the Federal Circuit Court of Appeals explained the Supreme Court's

---

1. In *Dethmers*, this court also quoted a portion of the *Festo* decision providing a "more detailed, but nevertheless succinct primer on prosecution history estoppel and its effect on the doctrine of equivalents." *See Dethmers Mfg. Co.*, 299 F.Supp.2d at 916 n. 2. Although "succinct," the court will not repeat that entire quotation here. For present purposes, suffice it to say that "[e]stoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those 'that have been cancelled or rejected.'" *Festo*, 535 U.S. at 733, 122 S.Ct. 1831 (quoting *Schriber–Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220–221, 61 S.Ct. 235, 85 L.Ed. 132 (1940)).

analytical procedure for determining when prosecution history estoppel bars consideration of "equivalents," as follows:

First, the Court agreed with our holding that "a narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel." *Festo VIII,* 535 U.S. at 736, 122 S.Ct. 1831. Second, however, the Court disagreed with our adoption of a complete bar to the doctrine of equivalents when prosecution history estoppel arises. *Id.* at 737, 122 S.Ct. 1831. The Court instead established a presumption that a narrowing amendment made for a reason of patentability surrenders the entire territory between the original claim limitation and the amended claim limitation, and explained that a patentee may overcome that presumption by showing that "at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent." *Id.* at 741, 122 S.Ct. 1831. Specifically, the Court enumerated the three ways in which the patentee may overcome the presumption—*i.e.,* by demonstrating [1] that "the equivalent [would] have been unforeseeable at the time of the [amendment]," [2] that "the rationale underlying the amendment [bore] no more than a tangential relation to the equivalent in question," or [3] that "there [was] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id.* at 740–41, 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944.

*Festo v. Shoketsu Kinzoku Kogyo Kabushiki,* 344 F.3d 1359, 1365 (Fed.Cir.2003) (footnote omitted), *cert. denied,* 72 U.S.L.W. 3513, —— U.S. ——, 124 S.Ct. 2018, 2019, 158 L.Ed.2d 492 (2004).

***ii. The decision on remand.*** On remand, the Federal Circuit Court of Appeals explained that the Supreme Court "observ[ed] that the narrowing amendments at issue in this case were made for reasons of patentability," and therefore remanded the case to the lower courts "to determine in the first instance whether Festo can demonstrate that those narrowing amendments did not surrender the particular equivalents in question." *Festo,* 344 F.3d at 1365. In the process of making that determination, the Federal Circuit Court of Appeals first reinstated a number of its holdings from its prior *en banc* decision, which had been vacated, but left undisturbed, by the Supreme Court. *See id.* at 1366–67. First, the court "recognize[d] that the [Supreme] Court expressly endorsed our holding that a narrowing amendment made to comply with any provision of the Patent Act, including § 112, may invoke an estoppel." *Id.* at 1366 (citing *Festo,* 535 U.S. at 736, 122 S.Ct. 1831). Second, the court reinstated its holding "that a 'voluntary' amendment may give rise to prosecution history estoppel." *Id.* Third, the court "clarif[ied] that the Supreme Court's *Warner–Jenkinson* presumption, which treats a narrowing amendment as having been made for a 'substantial reason related to patentability' when the record does not reveal the reason for the amendment, 520 U.S. at 33, 117 S.Ct. 1040, remains intact after the Court's *Festo* decision, although the consequences of failing to overcome that presumption have been altered." *Id.* Specifically,

[T]he *Warner–Jenkinson* and *Festo* presumptions operate together in the following manner: The first question in a prosecution history estoppel inquiry is whether an amendment filed in the Patent and Trademark Office ("PTO") has narrowed the literal scope of a claim. *Pioneer Magnetics, Inc. v. Micro Linear Corp.,* 330 F.3d 1352, 1356 (Fed.Cir. 2003). If the amendment was not narrowing, then prosecution history estoppel does not apply. But if the accused

infringer establishes that the amendment was a narrowing one, then the second question is whether the reason for that amendment was a substantial one relating to patentability. *See id.* When the prosecution history record reveals no reason for the narrowing amendment, *Warner–Jenkinson* presumes that the patentee had a substantial reason relating to patentability; consequently, the patentee must show that the reason for the amendment was not one relating to patentability if it is to rebut that presumption. *See id.* (citing *Warner–Jenkinson,* 520 U.S. at 33, 117 S.Ct. 1040, 137 L.Ed.2d 146). In this regard, we reinstate our earlier holding that a patentee's rebuttal of the *Warner–Jenkinson* presumption is restricted to the evidence in the prosecution history record. *Festo VI,* 234 F.3d at 586 & n. 6; *see also Pioneer Magnetics,* 330 F.3d at 1356 (stating that only the prosecution history record may be considered in determining whether a patentee has overcome the *Warner–Jenkinson* presumption, so as not to undermine the public notice function served by that record). If the patentee successfully establishes that the amendment was not for a reason of patentability, then prosecution history estoppel does not apply.

If, however, the court determines that a narrowing amendment has been made for a substantial reason relating to patentability—whether based on a reason reflected in the prosecution history record or on the patentee's failure to overcome the *Warner–Jenkinson* presumption—then the third question in a prosecution history estoppel analysis addresses the scope of the subject matter surrendered by the narrowing amendment. *See Pioneer Magnetics,* 330 F.3d at 1357. At that point *Festo VIII* imposes the presumption that the patentee has surrendered all territory between the original claim limitation and the amended claim limitation. *See Festo VIII,* 535 U.S. at 740, 122 S.Ct. 1831. The patentee may rebut that presumption of total surrender by demonstrating that it did not surrender the particular equivalent in question according to the criteria discussed below. Finally, if the patentee fails to rebut the *Festo* presumption, then prosecution history estoppel bars the patentee from relying on the doctrine of equivalents for the accused element. If the patentee successfully rebuts the presumption, then prosecution history estoppel does not apply and the question whether the accused element is in fact equivalent to the limitation at issue is reached on the merits.

*Festo,* 344 F.3d at 1366–67.

Turning to questions before the court on remand, the Federal Circuit Court of Appeals first concluded that "rebuttal of the presumption of surrender is a question of law to be determined by the court, not a jury." *Id.* at 1367. That being so, "[q]uestions relating to the application and scope of prosecution history estoppel thus fall within the exclusive province of the court. Accordingly, the determinations concerning whether the presumption of surrender has arisen and whether it has been rebutted are questions of law for the court, not a jury, to decide." *Id.* at 1368.

The last issue addressed by the Federal Circuit Court of Appeals in *Festo* that is of interest here is that court's determination of the factors pertinent to the criteria set forth by the Supreme Court as rebutting the presumption of surrender. *See id.* at 1368–70. The three rebuttal criteria, again, are "[1] that 'the equivalent [would] have been unforeseeable at the time of the [amendment],' [2] that 'the rationale underlying the amendment [bore] no more than a tangential relation to the equivalent in question,' or [3] that 'there [was] some

other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.' " *Id.* at 1365 (quoting *Festo*, 535 U.S. at 740–41, 122 S.Ct. 1831). The court concluded that it could not "anticipate all of the circumstances in which a patentee might rebut the presumption of surrender," but nevertheless "provide[d] ... general guidance ... regarding the application of the three rebuttal criteria." *Id.* at 1368–69. This court will return to the "guidance" provided by the Federal Circuit Court of Appeals on rebutting the presumption of "total surrender," if necessary, below.

### b. The "elongated locking member" and "interengagable notches" limitations

This court will first apply the *Festo* analysis to determine whether or not prosecution history estoppel bars assertion of any specific "equivalents" to the "elongated locking member" and "interengagable notches" limitations. The parties disagree vehemently on the outcome of this analysis.

*i. Was there a "narrowing" amendment?* The first step of the *Festo* analysis, again, is whether there was "a narrowing amendment." *Festo*, 344 F.3d at 1366 ("The first question in a prosecution history estoppel inquiry is whether an amendment filed in the Patent and Trademark Office ('PTO') has narrowed the literal scope of a claim."). The parties disagree about whether there was such an amendment to either the "elongated locking member" limitation or the "interengagable notches" limitation of the '456 patent. To decide who is right, the court must resort to the prosecution history of the '456 patent. A general timeline of the prosecution history of the '456 patent appears in *EPC II*, 225 F.Supp.2d at 1078–79. The parties focus their present discussion on certain details of that history.

Both parties begin their arguments with the original June 19, 1978, patent application. That application claimed, in Claim 1, "[a]n air filter restriction indicating device for internal combustion engines and the like equipped with an air filter comprising," *inter alia*, "means for progressively maintaining said indicator at the position it attains as the pressure in said negative zone decreases regardless of changes thereafter to higher pressures in said negative zone." *See* Affidavit of Craig J. Lervick In Support Of Plaintiff's Motion In Limine To Allow Evidence On Doctrine Of Equivalents (Lervick Affidavit), Exhibit A–1, p. 14. Claim 11 of that application included "an elongated latch element," which EPC contends is merely different language disclosing the "elongated locking member" now in dispute. *Id.* at 19–20. EPC acknowledges that Claim 1 of the application was rejected as anticipated by one existing patent (Smith), and the remaining claims, including Claim 11, were rejected as obvious in light of that patent combined with three other existing patents (Nelson, Rodgers, and Schmidt). The claims of the application were then canceled.

An amended application, filed November 5, 1979, and consisting of Claims 19 through 24, attempted to overcome the examiner's objections. Independent Claim 19 recited, *inter alia*, "lock-up and guiding means for guiding ... [and] progressively locking the indicating member in various positions." Lervick Affidavit, Exhibit A–4, pp. 5–6. The limitations at issue appeared in dependent Claim 21, which disclosed "an elongated locking member," and Claim 22, which disclosed "interengagable notches." *Id.* at pp. 6–7. The inventor received a Notice of Allowance for these claims in December 1979.

Notwithstanding the allowance of the application, the inventor filed a continuation on March 18, 1980, and then amended

the claims in October 1980, to attempt to make the invention read on the Donaldson Informer indicator. *See EPC I*, 165 F.Supp.2d at 855 (noting that, in 1980, "EPC requested the [PTO] to amend EPC's pending patent claim to specifically cover the Donaldson Informer indicator."). That amended application retained the previously allowed claims (Claims 19 through 24) with newly amended Claims 25 through 30 drafted to read on the Informer. Claim 25 included "an elongated locking member," *id.* at Exhibit A–5, pp. 8–9, while Claim 26 disclosed a device "wherein notches ... are adapted to engage the cylindrical rod so as to progressively lock and maintain the indicating member in the last position which it attains...." *Id.* at p. 9. Claims 19 through 30 of this second amended application were rejected on February 17, 1981, however, as obvious in light of two additional prior art references (Witchell and Leinfelt), although the examiner stated, "Claims 22–24 and Claim 29/26 if combined with Claim 30, allowable if amended as indicated" to overcome indefiniteness. *See id.* at Exhibit A–6.

Thereafter, EPC filed a continuation and amendment, which was again rejected,[2] and a final amendment, dated September 29, 1983, which attempted to restate allowable claims. This amendment was allowed on November 17, 1983, and issued as the '456 patent on May 1, 1984. Claim 1 of the '456 patent discloses, *inter alia*, "an elongated locking member," and "interengagable notches." Lervick Affidavit, Exhibit A, col. 7.

Thus, the terms "elongated locking member" and "interengagable notches" appeared with only slight variations throughout the prosecution of the '456 patent, as EPC contends. However, the context of these terms changed, and Donaldson argues that their scope was significantly narrowed as a consequence. To facilitate comparison of the context of these terms, the pertinent limitations from each stage of the prosecution history are presented side-by-side in the following chart, with key terms in bold, and new or different language in each successive amendment underlined:

| Original application (06/19/78) | First amendment (11/05/79) | Second amendment (10/80) | '456 patent (05/01/84) |
|---|---|---|---|
| An air filter restriction indicating device [including] | An improved restriction indicating device for an air filter [including] | An improved restriction indicating device for an air filter [including] | An improved restriction indicating device for an air filter [including] |
| Claim 11: * * *. | Claim 21: * * * | Claim 25: * * * | Claim 1: * * * |
| (3) **an elongated latch element** positioned axially and internally of said guide member and cooperating therewith to latch the guide member in a position depending upon the air pressure in said negative pressure side | wherein the lock-up and guiding means includes an **elongated** locking member having first and second ends, with the first one [sic] end of the locking member being supported by the second end of the housing and with the second end of the locking member extending into the recess in the cylindrical rod; and | the lock-up means also including **an elongated locking member** having a first and a second end, with the first end of the locking member being supported by the second end of the housing and with the second end of the locking member extending adjacent to the open end of the cylindrical rod and cooper- | the lock-up means also including **an elongated locking member** having a first and a second end, the locking member being supported by the second end of the housing so as to permit movement of the first end of the locking member between a first position and a second position; the first end of the locking |

2. Donaldson has provided the court with documents relating to the June 16, 1981, application, which EPC did not include. However, Donaldson does not rely on specific changes in that amendment as demonstrating "narrowing" amendments. Instead, Donaldson relies on the differences between the original application and the '456 patent. Therefore, the court has not found it necessary to discuss the June 16, 1981, amendments in detail at this point in the analysis.

| | | |
|---|---|---|
| wherein the indicating member is progressively locked and maintained in position by interengagement between the other end of the locking member and the cylindrical rod. | ating with the cylindrical rod so that the indicating member is progressively locked and maintained in position by engagement between the second end of the locking member and the cylindrical rod. | member being disposed, when the first end of the locking member is in its first position, adjacent to the open end of the tubular member; the second end of the locking member projecting from the second chamber through the opening in the second end of the housing; |
| Claim 22: <br> * * * <br> wherein interengagable notches are formed on the second end of the locking member and in the recess in the cylindrical rod and are adapted to interengage so as to progressively lock and maintain the indicating member in the last position which it attains as the diaphragm member is moved from its infold position to its outfold position. | Claim 26: <br> * * * <br> wherein notches are formed on the second end of the locking member and are adapted to engage the cylindrical rod so as to progressively lock and maintain the indicating member in the last position which it attains as the diaphragm member is moved from its infold position to its outfold position. | the first end of the locking member and the open end of the tubular member having interengagable notches thereon that are adapted to be engaged when the first end of the locking member is in its first position, with engagement between the notches permitting the diaphragm to move from its infold position to its outfold position but preventing the diaphragm from returning to its infold position. |

From the side-by-side statements, it is immediately apparent that the "elongated locking member" was narrowed in the course of prosecution history estoppel, as the structure constituting that "member" was claimed with ever increasing specificity. In the original application, the "elongated latch element" was merely "positioned axially and internally of said guide member," and the manner in which it locked up the indicator was merely "by cooperating" with the guide member. *See* Lervick Affidavit, Exhibit A–1, pp. 19–20. In Claim 21 of the first amended application, however, in addition to the arguably superficial change of wording from "elongated latch element" to "elongated locking member," the "elongated locking member" is claimed to have "first and second ends"; the "first end" is specified to be "supported by the second end of the housing"; and the "second end" is specified to be "extending into the recess in the cylindri-

cal rod." Lervick Affidavit, Exhibit A–4, p. 6. Furthermore, the manner in which the "elongated locking member" is claimed to lock up the indicator is "by interengagement between the other end of the locking member and the cylindrical rod," although it isn't clear which end, first or second, is the "other end" of the locking member. *Id.* In the second amendment, the "elongated locking member" is again specified in Claim 25 to have a "first end" and a "second end," and while the position of the "first end" has not changed, *i.e.*, it is still "supported by the second end of the housing," the "second end" is no longer claimed as "extending into the recess in the cylindrical rod," but is instead claimed as "extending into *the open end of* the cylindrical rod *and cooperating with the cylindrical rod.*" Lervick Affidavit, Exhibit A–5, p. 9 (emphasis added).[3] The '456 patent limitation for the "elongated locking member" discloses, still more narrowly, that it is the

---

**3.** In addition, the second amendment clarifies that, instead of locking up the indicator "by interengagement between the other end of the locking member and the cylindrical rod," the indicator is locked up "by engagement between the *second* end of the locking member and the cylindrical rod." Lervick Affidavit, Exhibit A–5, pp. 8–9.

"locking member," not just its "first end," that is "supported by the second end of the housing," and adds that this is "so as to permit movement of the first end of the locking member between a first position and a second position," which is a wholly new specification for the structure of the locking member. Lervick Affidavit, Exhibit A, col. 7. In addition, the "first end" is specified to be "disposed, when the first end of the locking member is in its first position, adjacent to the open end of the tubular member," id., which is certainly much narrower than merely positioning the entire "elongated latch element" "axially and internally of said guide member," as in the original application. See id., Exhibit A–1, pp. 19–20. Also, the "second end" is not described as "adjacent to the open end of the cylindrical rod," as in the second amendment, see id., Exhibit A–5, pp. 8–9, but more narrowly specified to be "projecting from the second chamber through the opening in the second end of the housing." Id. Exhibit A, col. 7.

The court finds a similar narrowing of the "interengagable notches" limitation in the course of prosecution. Indeed, the only limitation in the original application that is comparable to the "interengagable notches"—if there is one at all—is "cooperat[ion]" between the "elongated latch element" and the "guide member." See Lervick Affidavit, Exhibit A–1, p. 20. Claim 22 of the first amendment claims what appear to be the former "cooperating" means much more narrowly, in the form of a more specific structure comprising "interengagable notches on the second end of the locking member and in the recess in the cylindrical rod." Lervick Affidavit, Exhibit A–4, p. 7 (Claim 22). In Claim 26 of the second amendment, the "notches" are specified to be present only on the "second end of the locking member," and instead of "interengaging" notches in the cylindrical rod, the "notches" on the second end of the locking member "are

adapted to engage the cylindrical rod." Id., Exhibit A–5, p. 9. While this amendment might arguably be a "broadening" of the limitation, rather than a "narrowing," as compared to the first amendment, it is still a narrowing as compared to the original application. Finally, in the '456 patent, the "interengagable notches" are on the "first end of the locking member and the open end of the tubular member," and they are adapted to engage "when the first end of the locking member is in its first position," which is wholly new and narrower than prior disclosures, see id., Exhibit A, col. 7, even if the court assumes that the remainder of the specification, which specifies the movement and locking of the diaphragm, is analogous to the prior specification. Compare id., Exhibit A–5, pp. 8–9 (second amendment) (the engagement of the "notches" is "to progressively lock and maintain the indicating member in the last position which it attains as the diaphragm member is moved from its infold position to its outfold position"), with id., Exhibit A, col. 7 ('456 patent) (the "interengagable notches" "permi[t] the diaphragm to move from its infold position to its outfold position but preven[t] the diaphragm from returning to its infold position").

EPC contends, however, that it is improper for the court to look beyond the words "elongated locking member" and "interengagable notches" to determine whether there has been a "narrowing" of the limitation in the course of prosecution, citing Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1372–75 (Fed.Cir.2003). EPC argues that Ericsson requires the court to focus only on the "disputed elements," not on narrowing of surrounding language. EPC contends that the "disputed elements" are only the "elongated locking member" and the "interengagable notches," which are present in every statement of the claims. This court has a very different reading of Ericsson.

In *Ericsson*, the court considered a claim that required that " 'the speech signal amplifiers, which require power, *only* supply power to the telephone set when the receiver is off its cradle and a call can be made.' " *Ericsson*, 352 F.3d at 1374 (quoting the patent with emphasis added by the court). The court concluded that the "only supply power" limitation "refers only to power supplied by the speech signal amplifiers." *Id.* The court also concluded that a reasonable jury could have concluded that power supplied by certain transistors was not power supplied by the speech signal amplifiers, because those transistors were not part of the speech signal amplifiers, but part of the control circuitry. *Id.* at 1374–75. The limitation that "the speech signal amplifiers . . . only supply power to the telephone set" when the receiver is off-hook was never amended, although other elements were amended, and consequently, the unamended limitation was not subject to *Festo*. *Id.* at 1375. In other words, the specification of structure relating to the "only supply power" limitation was never amended.

In the course of the prosecution of the '456 patent, on the other hand, it is precisely the specification of the structure of the "elongated locking member" and the "interengagable notches" that was repeatedly amended in narrower and narrower terms. Thus, it is *Ericsson*, not *Festo*, that does not apply here. Therefore, contrary to EPC's contentions, and consistent with Donaldson's, the court concludes that the "elongated locking member" and the "interengable notches" limitations were both narrowed in the course of prosecution of the '456 patent.

■ *ii. Were the narrowing amendments for purposes of patentability?* As the Federal Circuit Court of Appeals explained on remand in *Festo*, "[I]if the accused infringer establishes that the amendment was a narrowing one, then the second question is whether the reason for that amendment was a substantial one relating to patentability." *Festo*, 344 F.3d at 1366. As that court also explained, "When the prosecution history record reveals no reason for the narrowing amendment, *Warner–Jenkinson* presumes that the patentee had a substantial reason relating to patentability; consequently, the patentee must show that the reason for the amendment was not one relating to patentability if it is to rebut that presumption." *Id.* at 1366–67. EPC argues that the amendments, even if narrowing, were not for reasons of patentability, because the pertinent claims of the first amendment were allowed, and EPC canceled those claims and filed a new application to attempt to make the patent read on the Donaldson Informer, not to avoid prior art. The court disagrees.

The prosecution history recounted above shows that the claims of the original application were rejected as either anticipated by or obvious in light of prior art. Even if the claims of the first amended application were allowable, the inventor *canceled those claims*, choosing to file a continuation and second amendment in an attempt to make the patent read on the Donaldson Informer. *See Festo*, 344 F.3d at 1366 (holding, *inter alia*, "that a 'voluntary' amendment may give rise to prosecution history estoppel"). The second amendment was also rejected *in light of prior art*, and two other amendments were filed, before the '456 patent issued. Thus, the record shows that the narrowing amendments to the pertinent limitations *were* for reasons related to patentability, and prosecution history estoppel applies. At the very least, EPC has failed to overcome the *Warner–Jenkinson* presumption that the reason for the amendments was patentability, if the record could be deemed to be silent on the reason, which the court finds that it is not. *Id.* at 1366–67 ("When the

prosecution history record reveals no reason for the narrowing amendment, *Warner–Jenkinson* presumes that the patentee had a substantial reason relating to patentability.").

***iii. Can EPC overcome the presumption of "total surrender"?*** As the Federal Circuit Court of Appeals explained on remand in *Festo,* "If ... the court determines that a narrowing amendment has been made for a substantial reason relating to patentability—whether based on a reason reflected in the prosecution history record or on the patentee's failure to overcome the *Warner–Jenkinson* presumption—then the third question in a prosecution history estoppel analysis addresses the scope of the subject matter surrendered by the narrowing amendment." *Id.* at 1367. Consequently, EPC must overcome the presumption imposed by the Supreme Court's decision in *Festo* that EPC "has surrendered all territory between the original claim limitation and the amended claim limitation." *See id.* (citing *Festo,* 535 U.S. at 740, 122 S.Ct. 1831).

Although there are three criteria under which EPC can rebut the presumption of "total surrender" of "equivalents," EPC relies on only the second, "that 'the rationale underlying the amendment [bore] no more than a tangential relation to the equivalent in question.'" *Id.* at 1365 (quoting *Festo,* 535 U.S. at 740–41, 122 S.Ct. 1831). As to that criterion, the Federal Circuit Court of Appeals explained,

> [T]his criterion asks whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent. See The American Heritage College Dictionary 1385 (3d ed.1997) (defining "tangential" as "[m]erely touching or slightly connected" or "[o]nly superficially relevant; divergent"); 2 The New Shorter Oxford English Dictionary 3215–16 (1993) (defining "tangential" as "merely touch[ing]

a subject or matter; peripheral"). Although we cannot anticipate the instances of mere tangentialness that may arise, *we can say that an amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim. See Pioneer Magnetics,* 330 F.3d at 1357. Moreover, much like the inquiry into whether a patentee can rebut the *Warner–Jenkinson* presumption that a narrowing amendment was made for a reason of patentability, *the inquiry into whether a patentee can rebut the Festo presumption under the "tangential" criterion focuses on the patentee's objectively apparent reason for the narrowing amendment.* As we have held in the *Warner–Jenkinson* context, *that reason should be discernible from the prosecution history record,* if the public notice function of a patent and its prosecution history is to have significance. *See id.* at 1356 ("Only the public record of the patent prosecution, the prosecution history, can be a basis for [the reason for the amendment to the claim]. Otherwise, the public notice function of the patent record would be undermined."); *Festo VI,* 234 F.3d at 586 ("In order to give due deference to public notice considerations under the *Warner–Jenkinson* framework, a patent holder seeking to establish the reason for an amendment must base his arguments solely upon the public record of the patent's prosecution, *i.e.,* the patent's prosecution history. To hold otherwise—that is, to allow a patent holder to rely on evidence not in the public record to establish a reason for an amendment—would undermine the public notice function of the patent record."). *Moreover, whether an amendment was merely tangential to an alleged equivalent necessarily requires focus on the context in which the amendment was made; hence the resort to the prosecution history.*

*Thus, whether the patentee has established a merely tangential reason for a narrowing amendment is for the court to determine from the prosecution history record without the introduction of additional evidence, except, when necessary, testimony from those skilled in the art as to the interpretation of that record.*

*Festo,* 344 F.3d at 1369–70 (emphasis added).

The court notes that, under the "tangential" criterion, the issue is whether the reasons for amendments to the patent were "'tangential ... *to the equivalent in question.'*" *Festo,* 344 F.3d at 1365 (quoting *Festo,* 535 U.S. at 740–41, 122 S.Ct. 1831) (emphasis added). Thus, this court believes that it must first identify that "equivalent." The "equivalent," obviously, is the NG Air Alert, but more specifically, it is the lock-up means in the NG Air Alert. EPC points to a drawing of what EPC describes as an "elongated locking member" from Donaldson's expert's report as representing the locking member of the NG Air Alert. Donaldson does not dispute this identification of the "equivalent," and indeed, includes in its own appendix in support of its motion to exclude evidence on the doctrine of equivalents, albeit without explanation of the reason for its inclusion, a copy of the "Krisko" patent, U.S. Patent No. 6,604,486 B1, originally filed August 15, 2000, and issued August 12, 2003, which is assigned to Donaldson. *See* Declaration of Christopher J. Sorensen (Sorensen Declaration) (docket no. 295), Exhibit I. That patent includes what appears to be the same "locking member" cited by EPC. Indeed, in separate submissions, Donaldson expressly identifies the Krisko patent as relating to the NG Air Alert. *See* Donaldson's Resistance To EPC's Motion In Limine To Preclude Donaldson From Presenting Any Theory Of Non–Infringement Based On Separate Patentability (docket no. 334). Therefore, the court finds that the Krisko patent is a fair representation of the NG Air Alert, and thus of the "equivalent in question," at least for present purposes. Figures 6A, 6B, and 6D from that patent show the indicator in "reset position," "first intermediate position," and "full warning/change filter position," and Figure 2A shows the locking member itself:

972

*See id.* at 3, 8-9, 10.

 Having identified the "equivalent," the court next turns to the question of "whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Festo,* 344 F.3d at 1369. EPC argues that the rationale for the amendments to the '456 patent demonstrates that the amendments were completely unrelated to the corre-

sponding potentially equivalent elements in the NG Air Alert. The rationale that EPC points to is the following from the September 29, 1983, amendment:

Another important practical advantage provided by applicant's device, as now claimed, is the compactness of the device as compared to the prior art devices. In truck and vehicle cabs, space

is a premium. The operation of applicant's device does not effect [sic] or change its overal [sic] dimensions. During operation, nothing progressively protrudes or extends out of the device which could be bent or stuck.

Lervick Affidavit, Exhibit A–7, p. 17. EPC points out that the primary prior art reference cited by the examiner (the Smith patent) had a protruding indicator and that the '456 eliminates this problem with the combination of the "elongated locking member" and the "interengagable notches." EPC contends that, in contrast, Donaldson's NG Air Alert uses elongated locking fingers, which are interengagable with progressive notches on the surrounding tubular member, which likewise result in a device without a protruding indicator, but which isn't directly related to the prior art that the '456 patent was attempting to overcome. Donaldson contends that EPC is ignoring the prior art references cited by the examiner that disclosed various kinds of elongated lock-up means, disposed "axially and internally," for progressive indicators. The examiner rejected the application for the '456 patent, Donaldson contends, because a combination of these prior art references required only mechanical skill rather than an inventive concept. In overcoming these prior art references by specifying ever narrower structures as constituting the "elongated locking member" and "interengagable notches," Donaldson argues that EPC necessarily gave up any "equivalent" that, like the NG Air Alert, was comprised of a lock-up means disposed "axially and internally."

While the "rationale" for amendments cited by EPC may be sufficient to explain in what way the asserted invention in the '456 patent avoids prior art with protruding indicators, like Smith, it says nothing about the rationale for amendments to the specific lock-up means for non-protruding indicators. The court finds from the prosecution history, *see Festo*, 344 F.3d at 1369 (the "reason [for the amendment] should be discernible from the prosecution history record"), that the examiner frequently pointed out that the lock-up means in the application was anticipated by, or obvious over, the prior art, as was the combination of such a lock-up means with a progressive indicator. For example, the examiner rejected the second amendment, in pertinent part—that is, as to application Claims 25 and 26—as follows:

> Claims 19–21, 25–27, 29/25 and 30 are rejected under 35 USC 103 as unpatentable over Lee et al in view of Witchell and Leinfelt and/or Smith (of record). It would be obvious to one skilled in the art, in view of the showings by Smith and Leinfelt (col. 2, lines 45–66) of known means to progressively lock an indicator means in various positions to indicate differential pressure changes, as a diaphragm means and/or a bellow means moves, to replace the notches locking means 59', 54, 49 (Figs.4–5) in Lee et al with known progressively locking means for the known indicating purpose, and to do so would involve only mechanical skill rather than an inventive concept.

Lervick Affidavit, Exhibit A–6, p. 4. This rejection says nothing whatever about the protruding indicator, and instead addresses anticipation of the locking means disclosed in the second amendment. Therefore, from "the context in which the [subsequent] amendment was made," and "focus[ing] on the patentee's objectively apparent reason for the narrowing amendment," *Festo*, 344 F.3d at 1369, the court concludes that the locking means, not the protruding indicator, was the central concern of the amendments to the pertinent limitations.

Thus, the question becomes whether or not the amendment to avoid prior art was nevertheless for a reason "tangential" to

**974**

the equivalent in question. *See id.* In *Festo,* the Federal Circuit Court of Appeals explained that, if the "amendment [was] made to avoid prior art that contains the equivalent in question," it is not "tangential" to the equivalent in question. *See id.* It is not immediately apparent what the Federal Circuit Court of Appeals meant by "prior art that contains the equivalent in question." On the other hand, the decision on which the *Festo* court relied for this proposition, *Pioneer Magnetics, Inc. v. Micro Linear Corp.,* 330 F.3d 1352 (Fed.Cir.2003), provides some clarification. In *Pioneer Magnetics,* the court considered whether the presumption of surrender of the equivalent in question had been rebutted, where the application was amended, in pertinent part, to claim "a switching analog multiplier circuit" to avoid the so-called "Carpenter reference." *Pioneer Magnetics,* 330 F.3d at 1355. The equivalent in question was a "non-switching multiplier circuit." *Id.* The court noted that "the Carpenter reference disclose[d] a non-switching multiplier circuit," so that "a non-switching circuit was known in the art" at the time of the amendment *Id.* at 1357. The court concluded that "[t]he amendment was clearly not tangential to the equivalent in question; the amendment was made to avoid the very prior art that contained the equivalent." *Id.* To put it another way, in *Pioneer Magnetics,* the prior art *literally* contained the precise element that the amendment was made to avoid.

That is not the case here. The locking means in the NG Air Alert may be *equivalent* to the locking means in the prior art that the amendments to the '456 patent were intended to avoid, but none of the prior art references cited by the examiner disclosed *literally* a locking means comprised of the precise structure found in the NG Air Alert. More specifically, several of the prior art references cited by the examiner disclosed an "elongated locking

member" comprised of a single member with one or more notches designed to engage and lock the diaphragm in position. *See, e.g.,* Lervick Affidavit, Exhibit E (U.S. Patent No. 1,546,409 (Schmidt)), p. 1; *id.,* Exhibit F (U.S. Patent No. 3,068,831 (Witchell)), p. 1; *id.,* Exhibit G (U.S. Patent No. 4,100,878 (Leinfelt)), p. 1; Sorensen Declaration, Exhibit C (U.S. Patent No. 3,066,527 (Stein)); *id.,* Exhibit D (U.S. Patent No. 3,443,365 (Lee)); *id.,* Exhibit H (U.S. Patent No. 3,465,707 (Kashiwaba)). However, none of the prior art references disclosed literally an elongated locking member comprised of a "hub" **52** from which several "retaining legs" **58** extend on each of which is a "resilient finger or retaining prong" **46** that engages "shoulders" (*i.e.,* "notches") **88, 90, 92** in the wall of the "bore" **82** to progressively lock the indicator in place. *See* Krisko patent, Figs. 6A, 6B, 6D, & 2A, *supra;* Sorensen Declaration, Exhibit I, cols. 4–5 (detailed description of Krisko patent). Thus, unlike the situation in *Pioneer Magnetics,* the amendments were not made to avoid prior art "containing" the equivalent in question.

Under all of the circumstances revealed by the prosecution history, including the lack of any citation to prior art disclosing literally the structure of the NG Air Alert's locking member, the court concludes that, " 'at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent.' " *Festo,* 344 F.3d at 1365 (quoting *Festo,* 535 U.S. at 741, 122 S.Ct. 1831, for this requirement to overcome the presumption of "total surrender" of equivalents). Rather, the amendments to the locking means limitations of the '456 patent were made for reasons "tangential" to the equivalent in question. *Id.* at 1365 (quoting *Festo,* 535 U.S. at 740–41, 122 S.Ct. 1831, which iden-

tifies this as one of three criterion for overcoming the presumption). Therefore, EPC is not barred from attempting to prove that the NG Air Alert infringes the locking means limitations of the '456 patent under the doctrine of equivalents.

### c. The "disengagement means" limitation

Donaldson also argues that the *Festo* analysis impacts both the construction of the "disengagement means" limitation and EPC's ability to assert infringement of that limitation under either literal or doctrine of equivalents infringement theories. The court turns next to consideration of these arguments.

***i. Arguments of the parties.*** Donaldson argues that *Festo* requires exclusion of any equivalents in the construction of the "disengagement means," because this limitation was also narrowed during prosecution for reasons related to patentability. Therefore, Donaldson argues that EPC should be precluded from offering evidence on "equivalents" of the "disengagement means," to prove either literal infringement or infringement under the doctrine of equivalents of this means-plus-function limitation. Furthermore, Donaldson argues that the court's prior construction of this means-plus-function limitation is so broad that it allows EPC to recapture the broad scope of the limitation that was abandoned during prosecution of the '456 patent. Donaldson argues that the court's construction reads out of the law the requirement that a means-plus-function claim that is narrowed by the description of the specific structure and structural relationship be limited to the specific structure and structural relationship so described. Therefore, Donaldson contends that the court's construction cannot stand.

EPC argues that reconsideration of the court's claim construction is not appropriate, because one motion to reconsider that construction has already been denied, and neither the law applicable to claim construction nor the facts have changed in the interim. EPC argues that the *Festo* decisions have no bearing whatsoever upon claim construction and the court's original construction is well-reasoned and correct. Moreover, EPC argues that there was no narrowing of the "disengagement means" limitation for purposes of patentability, and even if there was, the amendments bore no more than a tangential relationship to the equivalent disengagement means in the NG Air Alert.

In reply, Donaldson argues that the *Festo* decisions do, indeed, clarify the rules of claim construction, and thus, compel reconsideration of the court's construction of the "disengagement means" limitation. Moreover, Donaldson reiterates that, under the *Festo* analysis, neither the court's construction of the limitation, nor consideration of any infringement under the doctrine of equivalents is permissible.

***ii. The prior rulings.*** In his March 27, 2001, ruling on cross-motions for summary judgment in this case, after a *"Markman* hearing," Judge Melloy construed the means-plus-function element of Claim 1 of the '456 patent, which claims " 'means for selectively disengaging the interengagable notches so as to permit the diaphragm to return to its infold position when the vacuum in the first chamber is relatively low.' " *See EPC I,* 165 F.Supp.2d at 878 (quoting the '456 patent, col. 7, lines 52–55). Judge Melloy noted that his task was to "determine the claimed function and identify the structure or structures which perform that function," because "[t]he claim's scope is limited to that structure and its equivalents." *Id.*

After reviewing the arguments of the parties, the language of the claim and the specification, as well as the applicable standards articulated by the Federal Circuit

Court of Appeals for construing a means-plus-function claim, Judge Melloy explained his construction of what he called the "reset means" claim as follows:

> [T]he court agrees with EPC that the structure for selectively disengaging the interengagable notches cannot be limited to that which performs a "pivoting function." The claim recites disengagement of interengagable notches on the locking and tubular members and the meaning of those components—locking member, tubular member, and interengagable notches—has already been construed. It follows that the Court cannot construe the "selectively disengaging" function in a manner that would indirectly narrow those previously defined terms. As this Court reads Donaldson's proposed interpretation, it would do just that by effectively limiting "locking member" and "notches" to a version which utilizes a pivoting movement in disengaging the notches on the locking and tubular members, as in the preferred embodiment. That embodiment, however, is merely one proposed actualization of the invention, and in another embodiment the locking member and interengagable notches could look quite different but still fall within the scope of the claim. The Court will not limit the legitimate breadth of that difference by requiring one particular disengagement method where the specification describes structure that can fully perform the function in a less restricted manner. *Here, the Court agrees with EPC that that structure is the button which receives and transfers forces which overcome the reset button spring and move the locking member away from its engaged position so that the coiled compression spring can then push the diaphragm back to its infold position.*

*EPC I*, 165 F.Supp.2d at 880 (emphasis added).

Donaldson moved the court to reconsider this construction of the "disengaging means" claim, arguing that Judge Melloy had improperly interpreted and applied recent Federal Circuit case law, thereby construing the "reset means" too broadly. *See* Opinion and Order, June 11, 2001 (docket no. 128), at 2. Judge Melloy denied Donaldson's motion on June 11, 2001. *Id.* Judge Melloy concluded that the "new" case law on which Donaldson relied had already been brought to the court's attention prior to the "*Markman* hearing," and that it did not change the court's analysis, because "the critical determination remains which structural components disclosed in the specification and drawings are essential to performing the claimed function, in this case, 'selectively disengaging' the interengagable notches of the locking member and the tubular member." *Id.* at 3–4.

Moreover, Judge Melloy rejected the motion to reconsider for the following reasons:

> [a]fter thoroughly reviewing the parties' briefs and case law cited therein, the court stands by its earlier ruling for the reasons discussed therein. The fact that the button affects other discrete structures to achieve the result of disengaging the notches does not make all of those structures with which it interacts essential to performance of the function or a "defining characteristic" of the element. As observed by EPC, given that mechanical devices are composed of a series of components that interact, cooperate and act on one another, Donaldson's theory would leave no logical basis for deciding which structures are truly necessary for performing a particular claimed function and which structures are not. Thus, guided by *Wenger [Mfg., Inc. v. Coating Machinery Sys., Inc.,* 239 F.3d 1225 (Fed.Cir.2001),]* and other federal circuit case law, *the court main-

*tains its earlier conclusion that in this case the essential disengaging function is performed entirely by the button.*

Opinion and Order, June 11, 2001, at 4 (emphasis added). Judge Melloy also denied Donaldson's alternative motion to certify the issue for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Id.* at 4–7.

■ ***iii. Standards for reconsideration.*** Donaldson seeks, once again, to have this court reconsider Judge Melloy's conclusion that "the essential disengaging function is performed entirely by the button." As EPC points out, this court recently summarized the standards for reconsideration of a summary judgment ruling in a patent case, as follows:

> [R]econsideration of [a party's] original motion for summary judgment [in a patent case] is governed by the judicially-created "law of the case" doctrine and/or exceptions to that doctrine. *See, e.g., Suel v. Secretary of Health & Human Servs.*, 192 F.3d 981, 984 (Fed.Cir.1999) ("Law of the case is a judicially created doctrine."). "Under the doctrine of the law of the case, 'a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation.'" *Augustine v. Principi*, 343 F.3d 1334, 1339 (Fed.Cir.2003) (quoting *Suel*, 192 F.3d at 985); *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed.Cir.1995) ("'The law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts.'") (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1550 (Fed. Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed.Cir.1992)).

However, the "law of the case" doctrine means different things in different contexts:

> The [law of the case] doctrine ... is applied more or less strictly depending on the circumstances of the case. When a judgment of a trial court has been appealed, the decision of the appellate court determines the law of the case, and the trial court cannot depart from it on remand. At the trial level however, the law of the case is little more than a management practice to permit logical progression toward judgment. Orderly and efficient case administration suggests that questions once decided not be subject to continued argument, but the court has the power to reconsider its decisions until a judgment is entered.

*Jamesbury Corp.*, 839 F.2d at 1550 (footnotes and quotation marks omitted)....

Where a district court has denied summary judgment, without intervening appellate review, the standard for reconsideration is the following:

> The standard to be applied by a district court in reconsidering a motion for summary judgment was set out in *Corporacion de Mercadeo Agricola v. Mellon Bank International*, [608 F.2d 43 (2d Cir.1979)]:

>> [O]n a renewed motion for summary judgment before a second judge, the district court must balance the need for finality against the forcefulness of any new evidence and the demands of justice. *With respect to a non-appealable denial of summary judgment, the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court. The*

*first judge always has the power to change a ruling; further reflection may allow a better informed ruling in accordance with the conscience of the court. A fortiori, if the first judge can change his mind after denying summary judgment, and change his ruling, a second judge should have and does have the power to do so as well.*

[*Corporacion de Mercadeo Agricola,* 608 F.2d at 48.] *Jamesbury Corp.*, 839 F.2d at 1551 (emphasis added). Thus, the standard for reconsideration of a prior summary judgment ruling by the trial court—at least in the absence of an intervening appeal—is quite generous. *Dethmers Mfg. Co., Inc. v. Automatic Equip. Mfg. Co.,* 299 F.Supp.2d 903, 911–912 (N.D.Iowa 2004). In light of the generous standard for reconsideration of a prior ruling in the absence of intervening appellate review, this court finds that it may reopen the question of the proper construction of the "disengaging means" limitation. Such a course is particularly appropriate, if there is some possibility that the prior claim construction cannot stand in the face of intervening decisions by higher courts.

**iv. Does the Festo analysis apply to claim construction?** Donaldson's argument that the *Festo* decisions have an impact on, and require reconsideration of, the construction of the means-plus-function claim at issue here relies on three propositions. First, it relies on the Supreme Court's statement that "[e]stoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those 'that have been cancelled or rejected.'" *Festo,* 535 U.S. at 733, 122 S.Ct. 1831 (quoting *Schriber–Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 220–221, 61 S.Ct. 235, 85 L.Ed. 132 (1940)). Second, Donaldson points out that the Federal Circuit Court of Appeals recognized pre-*Festo* that, "[j]ust as prosecution

history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction under § 112, ¶ 6 [authorizing means-plus-function claims]." *See Alpex Computer Corp. v. Nintendo Co. Ltd.,* 102 F.3d 1214, 1221 (Fed.Cir.1996), *cert. denied,* 521 U.S. 1104, 117 S.Ct. 2480, 138 L.Ed.2d 989 (1997). Third, Donaldson notes that the statute authorizing means-plus-function claims states that such a claim "shall be construed to cover the corresponding structure, material, or acts described in the specification *and equivalents thereof.*" 35 U.S.C. § 112, ¶ 6 (emphasis added). Therefore, Donaldson argues, the *Festo* analysis of the scope of estoppel applies to claim construction and literal infringement of a means-plus-function claim, as well as to infringement of a means-plus-function claim under the doctrine of equivalents, because the *Festo* analysis determines the scope of permissible "equivalents."

The court is not entirely persuaded by Donaldson's argument. The principal flaw, the court finds, is that Donaldson's argument fails to recognize that "equivalents" for purposes of construction of a means-plus-function claim and literal infringement are not precisely the same as "equivalents" for purposes of infringement of such a claim under the doctrine of equivalents. To demonstrate Donaldson's confusion, the court must consider the process for construing a means-plus-function claim, then consider the relationship between the claim as construed and infringement under either literal or doctrine of equivalents theories.

"First and foremost, the analytical focus of claim construction must begin, and remain centered, on the language of the claims themselves." *ACTV, Inc. v. Walt Disney Co.,* 346 F.3d 1082, 1088

(Fed.Cir.2003); *accord Combined Sys., Inc. v. Defense Tech. Corp. of Am.,* 350 F.3d 1207, 1210 (Fed.Cir.2003) ("The language of the claim defines the boundary of its scope. *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1324 (Fed.Cir.2002). Accordingly, 'the claim construction inquiry ... begins and ends in all cases with the actual words of the claim.' *Id.* (quoting *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed.Cir. 1998)). Claim terms must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains. *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 986 (Fed.Cir. 1988)."). The process of construing a means-plus-function claim proceeds as follows:

> The first step in construing a means-plus-function claim limitation is to define the particular function of the claim limitation. *Budde v. Harley-Davidson, Inc.,* 250 F.3d 1369, 1376 (Fed.Cir.2001). "The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 296 F.3d 1106, 1113 (Fed.Cir.2002).... Ordinary principles of claim construction govern interpretation of this claim language, *see id.,* and ... we construe this function according to its ordinary meaning....

> The next step in construing a means-plus-function claim limitation is to look to the specification and identify the corresponding structure for that function. "Under this second step, 'structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" *Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1210 (Fed. Cir.2003) (quoting *B. Braun Med. Inc. v.*

*Abbott Labs.,* 124 F.3d 1419, 1424 (Fed. Cir.1997)).

*Golight, Inc. v. Wal-Mart Stores, Inc.,* 355 F.3d 1327, 1333-34 (Fed.Cir.2004); *ACTV, Inc.,* 346 F.3d at 1087 ("In construing a means-plus-function limitation drafted in accordance with § 112, ¶ 6, the recited function within that limitation must first be identified. Then, the written description must be examined to determine the structure that corresponds to and performs that function.") (citations omitted).

■ Infringement, in turn, depends upon a comparison of the properly construed claims of the patent to the accused device. *See, e.g., Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc.,* 347 F.3d 1314, 1322 (Fed.Cir.2003) ("An infringement analysis, whether literal or under the doctrine of equivalents, requires two steps: (1) construction of the claims to determine the scope and meaning of the asserted claims; and (2) comparison of the properly construed claims with the allegedly infringing device."), *cert. denied,* —— U.S. ——, 124 S.Ct. 1426, 158 L.Ed.2d 88 (2004). A patentee may prove infringement of a means-plus-function claim under either a literal infringement theory or a doctrine of equivalents theory. *See Lockheed Martin Corp. v. Space Sys./Loral, Inc.,* 324 F.3d 1308, 1320 (Fed. Cir.2003) ("An accused structure that does not literally infringe a means-plus-function claim may nevertheless infringe under the doctrine of equivalents."). "Literal infringement of a § 112 ¶ 6 claim requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical *or equivalent* to the corresponding structure in the specification." *Id.* (emphasis added). For purposes of literal infringement, an accused device is "equivalent to the corresponding structure in the specification" if it is "*insubstantially different* with respect

to structure." *See, e.g., Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1267 (Fed.Cir.1999) (emphasis added). Infringement under the doctrine of equivalents likewise turns on whether or not there are only "insubstantial differences" between the patented claim and the accused infringing device, *see Talbert Fuel Sys. Patents Co. v. Unocal Corp.,* 347 F.3d 1355, 1360 (Fed.Cir.2003) (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39–40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)), but that does not mean that the analysis of claim construction, literal infringement, and doctrine of equivalents infringement of a means-plus-function claim are all precisely the same, as Donaldson seems to argue.

The Federal Circuit Court of Appeals has continued to recognize, post-*Festo,* that, "[a]lthough the analyses of insubstantial difference are similar, a court must conduct a separate infringement analysis under the doctrine of equivalents after conducting an analysis of literal infringement for ` claim limitations written in means-plus-function format if both literal infringement and infringement under the doctrine of equivalents are asserted." *ACTV, Inc.,* 346 F.3d at 1094 (citing *Apex Inc. v. Raritan Computer, Inc.,* 325 F.3d 1364, 1378 (Fed.Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 922, 157 L.Ed.2d 742 (2003)). Moreover,

> [f]or a limitation written in means-plus-function form, evidence and arguments concerning equivalents under § 112, ¶ 6 may substantially overlap with those concerning the doctrine of equivalents. However, the evidence and arguments concerning the two "types" of equivalents, and their respective analyses, are by no means perfectly coextensive. *See, e.g., Kemco Sales, Inc. [v. Control Papers Co., Inc.],* 208 F.3d [1352,] 1364–65 [ (Fed.Cir.2000) ].

*ACTV,* 346 F.3d at 1094. The differences between "equivalents" for purposes of literal infringement and for purposes of infringement under the doctrine of equivalents, when a means-plus-function claim is at issue, thus require some further exploration.

In *Kemco Sales, Inc. v. Control Papers Co., Inc.,* 208 F.3d 1352 (Fed.Cir.2000), the Federal Circuit Court of Appeals explained that literal infringement of a means-plus-function claim requires proof that the two structures are "equivalent," that is, that "they perform the *identical* function, in *substantially* the same way, with *substantially* the same result." *Kemco Sales, Inc.,* 208 F.3d at 1364 (describing this test as the "functions-way-result methodology") (emphasis added). On the other hand,

> [i]f an accused structure is not a section 112, paragraph 6 equivalent of the disclosed structure because it does not perform the identical function of that disclosed structure and hence does not literally infringe, it may nevertheless still be an "equivalent" under the doctrine of equivalents. Thus, if one applies the traditional function-way-result test, the accused structure must perform *substantially* the same function, in *substantially* the same way, to achieve *substantially* the same result, as the disclosed structure. *See Dawn Equipment Co. v. Kentucky Farms Inc.,* 140 F.3d 1009, 1016, 46 USPQ2d 1109, 1113 (Fed.Cir.1998). *A key feature that distinguishes "equivalents" under section 112, paragraph 6 and "equivalents" under the doctrine of equivalents is that section 112, paragraph 6 equivalents must perform the identical function of the disclosed structure, see Odetics,* 185 F.3d at 1267, 51 USPQ2d at 1229; *Pennwalt,* 833 F.2d at 934, 4 USPQ2d at 1739, *while equivalents under the doctrine of equivalents need only per-*

*form a substantially similar function,* see *Al–Site Corp. v. VSI Int'l, Inc.,* 174 F.3d 1308, 1320–21, 50 USPQ2d 1161, 1168 (Fed.Cir.1999).

Because the "way" and "result" prongs are the same under both the section 112, paragraph 6 and doctrine of equivalents tests, a structure failing the section 112, paragraph 6 test under either or both prongs must fail the doctrine of equivalents test for the same reason(s).

*Kemco Sales, Inc.,* 208 F.3d at 1364 (emphasis added).

 From this review of the rules for construing and determining infringement of a means-plus-function claim, the court reaches a number of conclusions. First, claim construction, even of means-plus-function claims, begins with, and remains focused on, the language of the claim. *See Combined Sys., Inc.,* 350 F.3d at 1210; *ACTV, Inc.,* 346 F.3d at 1088. Certainly, construction of the "function" of a means-plus-function claim is *entirely* a question of the language of the claim, because " '[t]he court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations.' " *See Golight, Inc.,* 355 F.3d at 1333 (quoting *Cardiac Pacemakers, Inc.,* 296 F.3d at 1113). Similarly, determining the structure that corresponds to that function also begins with the language of the means-plus-function claim, but then turns to examination of the language of the specification. *See id.* at 1334 (the second step in construing a means-plus-function claim is "to look to the specification and identify the corresponding structure for that function"). Reference is made to the prosecution history *only* at this second step in the construction of a means-plus-function claim, and *only* to determine two things: (1) what structure "corresponds" to the function recited in the means-plus-function claim, *see id.* ("[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.") (internal quotation marks and citations omitted); and (2) to determine whether the patentee has taken an inconsistent position regarding the "corresponding structure" in the specification in the course of prosecution of the claim. *See Alpex Computer Corp.,* 102 F.3d at 1221.

Thus, the full *Festo* analysis does not come into play in construction of a means-plus-function claim, but the court may be required to determine whether the applicant "narrowed" the definition of the "corresponding structure" in the course of prosecution of the patent *to determine what structure corresponds to the claimed function.* As the Federal Circuit Court of Appeals has explained,

> The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function. This is why structures with different numbers of parts may still be equivalent under § 112, ¶ 6, thereby meeting the claim limitation. The appropriate degree of specificity is provided by the statute itself; the relevant structure is that which "corresponds" to the claimed function.

*See Odetics, Inc.,* 185 F.3d at 1268 (citations omitted). Donaldson's argument, on the other hand, would turn the specification of a means-plus-function claim *into the claim,* by limiting any means-plus-function claim to *only* the structure disclosed in the specification, if the specification was narrowed in the course of prosecution, instead of recognizing that what is claimed is the *means-plus-function,* i.e., "the overall

structure corresponding to the claimed function." *Id.*

Turning to infringement of a means-plus-function claim or limitation, the authorities above demonstrate that the full *Festo* analysis is *not* relevant to literal infringement, once the means-plus-function claim has been properly construed. This is true, even though literal infringement of a means-plus-function claim requires consideration of whether the accused device performs "the identical function recited in the claim and [is] identical *or equivalent* to the corresponding structure in the specification." *See Lockheed Martin Corp.*, 324 F.3d at 1320 (emphasis added). The question of "equivalence" here applies only to whether there are "insubstantial differences" in the *structure* of the accused device, *see Odetics, Inc.*, 185 F.3d at 1267; the accused device must perform the *identical function. Kemco Sales, Inc.*, 208 F.3d at 1364 ("A key feature that distinguishes 'equivalents' under the doctrine of equivalents is that section 112, paragraph 6 equivalents must perform the identical function of the disclosed structure, while equivalents under the doctrine of equivalents need only perform a substantially similar function.") (citations omitted). "Structural equivalence under § 112, ¶ 6 is, as noted by the Supreme Court, 'an application of the doctrine of equivalents ... in a restrictive role.'" *Odetics, Inc.*, 185 F.3d at 1267 (quoting *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). The "insubstantial differences" test for literal infringement of a means-plus-function limitation is thus "narrower" than the doctrine of equivalents, even though "rooted in similar concepts of insubstantial differences." *Id.* "The similar analysis of equivalents under § 112, ¶ 6 and the doctrine of equivalents does not, however, lead to the conclusion that [Supreme Court precedents] command a component-by-component analysis of structural equivalence under § 112, ¶ 6." *Id.* at 1267–68. Consequently, *Festo*—which explains how prosecution history estoppel affects infringement under the doctrine of equivalents—does not, and does not purport to, address either construction or literal infringement of a means-plus-function claim. On the other hand, *Festo* obviously does apply to infringement of a means-plus-function claim under the doctrine of equivalents, because the *Festo* analysis will be determinative of the scope of equivalent *functions* that may be considered. *See Kemco Sales, Inc.*, 208 F.3d at 1364 (for a means-plus-function claim to be infringed under the doctrine of equivalents, "the accused structure must perform *substantially* the same function, in *substantially* the same way, to achieve *substantially* the same result, as the disclosed structure") (emphasis added).

### v. *Does the prosecution history limit the prior claim construction, literal infringement, or doctrine of equivalents infringement?*

The court must next determine whether the proper impact of prosecution history at each step of the analysis requires reconsideration of Judge Melloy's construction of the "disengaging means" limitations, limits the scope of "equivalents" for purposes of literal infringement, or bars entirely consideration of infringement under the doctrine of equivalents, as Donaldson contends. Again, the court finds that it is helpful to present side-by-side the various statements of the "disengaging means" limitation and the corresponding part of the specification from significant stages in the prosecution of the '456 patent. Changes from one version to the next are again shown by underlining. "Button" is shown in bold, because that is the struc-

ture that Judge Melloy identified as performing the disengaging function.

| Original application (06/19/78) | First amendment (11/05/79) | Second amendment (10/80) | '456 patent (05/01/84) |
|---|---|---|---|
| Claim 2: An air filter restriction indicating device as claimed in Claim 1 including means for manually resetting said indicator to indicate a higher air pressure in said negative zone when such is again present therein. | Claim 20: The improved restriction indicating device described in Claim 19 which includes means for selectively unlocking the indicating member and for permitting the indicating member to return to its nested position adjacent to the closed end portion of the diaphragm member. | Claim 20: [same] | Claim 1: An improved restriction indicating device for an air filter … comprising:<br>* * *<br>means for selectively disengaging the interengagable notches so as to permit the diaphragm to return to its infold position when the vacuum in the first chamber |
| Claim 12: An air filter restriction indicating device as claimed in Claim 11 wherein means are provided for manually disengaging the said latch element and the guide member when desired. | Claim 23: The improved restriction indicating device described in claim 22 which includes means for permitting the selective disengagement of the notches from without the housing. | Claim 27: The improved restriction indicating device described in Claims 25 or 26 which includes means for selectively unlocking the engagement between the second end of the locking member and the cylindrical rod from without the housing. | is relatively low. |
| Specification: When it is desired to reset the indicator after cleaning or replacement of the air filter and after the member 96 has locked itself in its upper position, the thumb of the operation [sic] shown in dotted lines in FIGURE 4, is pressed against the **button** 114 to move the member 96 to the dotted line position by reason of the enlarged hole 50, as shown in FIGURE 4, to release the notched latching elements 97 and 100 and permit spring 80 to return the indicating assembly to its home position shown in FIGURE 1, and indicating that the lowest amount of inches of water vacuum is present in the negative air supply to the engine. | Specification: [the only amendment was to change "operation" to "operator"] | Specification: [same] | Specification: When it is desired to reset the indicator after cleaning or replacement of the air filter and after the member 96 has been locked up, as shown in FIG. 4, the thumb of the operator, as shown in FIG. 4, is pressed against the **button** 114 to move the member 96 from its off-center position to a vertical dotted line position by reason of the cooperation between the flange 104 and the bottom wall 42 and the enlarged hole 50, as shown in FIG. 4, to release the notches 96 and 100 and permit spring 80 to return the indicating assembly to its lower home position, as shown in FIG. 1, and indicating that the lowest amount of inches of water vacuum is present in the negative air supply to the engine. . . . |
| | | | If it is desired to permit the diaphragm to return to its infold position, as shown in FIG. 3, a person need only push the button 114, as shown in FIG. 4, against the bias of the spring 116. This will cause the locking member 96 to pivot, about the flange 104, from its cocked, off-center position, shown in FIGS. 3 and 4, to a vertical position where the notches 98 can no longer engage the notches 100. The bias of the spring 80 then readily returns the diaphragm 54 to its infold position shown in FIG. 3. |

*See* Lervick Affidavit, Exhibit A–1 (original application), p. 12 (specification) & 15 (Claim 2) & 20 (Claim 12); *id.*, Exhibit A–4 (first amendment), p. 3 (specification) & 6 (Claim 20); *id.*, Exhibit A–5 (second amendment), p. 2 (specification) & 9 (Claim 27); *id.*, Exhibit A ('456 patent), col. 5, ll. 50–62, col. 6, ll. 9–18 (specifications) & co. 7, ll. 52–55 (means-plus-function limitation).

Donaldson does not appear to challenge Judge Melloy's conclusion, on the first step of claim construction, *see, e.g., Golight, Inc.,* 355 F.3d at 1334 ("The first step in construing a means-plus-function claim limitation is to define the particular function of the claim limitation."), that "[t]he plain language of the claim explicitly defines the function as to 'selectively disengag[e] the interengagable notches so as to permit the diaphragm to return to its infold position when the vacuum in the first chamber is relatively low.'" *EPC I,* 165 F.Supp.2d at 878–79. Thus, the only questions, for purposes of reconsideration of the construction of the "disengaging means" limitation, are (1) whether the prosecution history affects what structure "corresponds" to the function recited in the means-plus-function claim, *see Golight, Inc.,* 355 F.3d at 1334 ("[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.") (internal quotation marks and citations omitted); and (2) whether the prosecution history shows that the patentee has taken an inconsistent position regarding the "corresponding structure" in the specification in the course of prosecution of the claim. *See Alpex Computer Corp.,* 102 F.3d at 1221. The answer to both questions is no. In every version of the specification, to reset the indicator, "the thumb of the operator … is pressed against the button." In the '456 patent,

the additional specification likewise specifies that, to return the diaphragm to its infold position, "a person need only push the button." Thus, the specification and the prosecution history clearly link or associate only the "button" structure to the "selective disengagement" function recited in the claim. *Golight, Inc.,* 355 F.3d at 1334. As Judge Melloy concluded, the specification of various members acted upon by pressing the button does not make those members part of the necessary structure for performing the claimed function. *EPC I,* 165 F.Supp.2d at 879; *see also* Opinion and Order, June 11, 2001 (docket no. 128), at 4.

■ Nor does the prosecution history limit the "equivalent" structures upon which EPC may rely to prove literal infringement. Again, to prove literal infringement of this means-plus-function limitation, EPC must prove that the accused equivalent "perform[s] the *identical* function, in *substantially* the same way, with *substantially* the same result." *Kemco Sales, Inc.,* 208 F.3d at 1364 (describing this test as the "functions-way-result methodology") (emphasis added); *accord Lockheed Martin Corp.,* 324 F.3d at 1320. The "substantially the same way" step in the test is satisfied by structures that are "insubstantially different." *See Odetics, Inc.,* 185 F.3d at 1267. This does not, however, "command a component-by-component analysis of structural equivalence under § 112, ¶ 6," even of structures specified by the patentee as performing the required function. *Id.* at 1267–68. Thus, it follows with even more certainty that proof of literal infringement does not require a component-by-component analysis of other members upon which the necessary structure acts to perform the required function.

■ The analysis of the question of whether prosecution history limits the scope of equivalents for infringement un-

der the doctrine of equivalents is somewhat more complicated. At this point, the full *Festo* analysis applies. Nevertheless, the court finds no "narrowing" amendment of the structure actually performing the "disengagement" function in the course of prosecution of the '456 patent. *Festo*, 344 F.3d at 1366 ("The first question in a prosecution history estoppel inquiry is whether an amendment filed in the Patent and Trademark Office ('PTO') has narrowed the literal scope of a claim."). That structure was, at all times, the "button." Therefore, that portion of the analysis need proceed no further.

■ Whether or not there was a narrowing amendment to the "function" part of the means-plus-function claim is a closer question. In the original application, the resetting function was stated as "manually resetting the indicator to indicate a higher air pressure in said negative zone when such is again present therein" and "manually disengaging the said latch element and the guide member when desired." *See* Lervick Affidavit, Exhibit A–1, pp. 15 & 20. In the '456 patent, on the other hand, the function is described as "selectively disengaging the interengagable notches so as to permit the diaphragm to return to its infold position when the vacuum in the first chamber is relatively low." *Id.*, Exhibit A, col. 7. Precisely what is "reset" or "disengaged" thus was narrowed from "the indicator" or "said latch element and the guide member" to "the interengagable notches."

The court has perused in vain the examiner's rejections of the various applications for any statement of grounds for rejecting *the "disengagement means" limitation,* apart from rejection of the claim in which that limitation is found or from which it depends as obvious or indefinite *as to other limitations,* specifically, the lock-up means limitations. The court has likewise found no specific statement of the paten-

tee's rationale for an amendment to the "disengagement means" limitation. In the face of this apparent silence, the court must presume that the amendments to the "disengagement means" limitation were for reasons of patentability. *See Festo*, 344 F.3d at 1366–67 ("When the prosecution history record reveals no reason for the narrowing amendment, *Warner–Jenkinson* presumes that the patentee had a substantial reason relating to patentability.").

At the final step of the *Festo* analysis, however, the court concludes that EPC can overcome the presumption that EPC "has surrendered all territory between the original claim limitation and the amended claim limitation," *see id.* (citing *Festo*, 535 U.S. at 740, 122 S.Ct. 1831), that is, the territory between "resetting said indicator" or "disengaging the said latch element and the guide member when desired" and "disengaging the interengagable notches." EPC has again shown "that 'the rationale underlying the amendment [bore] no more than a tangential relation to the equivalent in question.'" *Id.* at 1365 (quoting *Festo*, 535 U.S. at 740–41, 122 S.Ct. 1831). The prior art may, as Donaldson argues, disclose various means to release or disengage "notched" lock-up members on air filter restriction indicators. Nevertheless, none discloses *literally* means for disengaging elongated locking fingers, as on the NG Air Alert. Under all of the circumstances revealed by the prosecution history, including the lack of any citation to prior art disclosing literally the NG Air Alert's disengagement means, the court concludes that, " 'at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent.'" *Festo*, 344 F.3d at 1365 (quoting *Festo*, 535 U.S. at 741, 122 S.Ct. 1831, for this requirement to overcome the presumption of "total surrender" of equivalents). Rather, the

amendments to the disengagement means limitations of the '456 patent were made for reasons "tangential" to the equivalent in question. *Id.* at 1365 (quoting *Festo,* 535 U.S. at 740–41, 122 S.Ct. 1831, which identifies this as one of three criterion for overcoming the presumption). Therefore, EPC is not barred from attempting to prove that the NG Air Alert infringes the "disengagement means" limitation of the '456 patent under the doctrine of equivalents.

### B. Willful Infringement

■ The other motion relating to evidence in support of EPC's case in chief is Donaldson's January 9, 2004, Motion To Exclude Any Reference Or Mention Of Willful Infringement At Trial (docket no. 248). EPC resisted that motion on January 16, 2004 (docket no. 269).

#### 1. Arguments of the parties

Donaldson argues, in essence, that, because the court denied EPC's motion for summary judgment on the equitable defenses of laches and estoppel, and on EPC's claim of infringement, Donaldson by definition has several substantive and good faith defenses to EPC's infringement claims, so that Donaldson's infringement, if any, cannot be deemed "willful." Therefore, Donaldson contends that it would be unduly prejudiced by any reference to "willful" infringement in the trial of this case. More specifically, Donaldson contends that, in *State Contracting & Engineering Corp. v. Condotte America, Inc.,* 346 F.3d 1057, 1063–65 (Fed.Cir.2003), the Federal Circuit Court of Appeals held that a patentee cannot meet its burden of clear and convincing evidence that the accused infringer had no reasonable belief that it was not infringing, where the accused infringer presents a substantial defense to an infringement claim. The court's summary judgment ruling, Donaldson argues, demonstrates that a jury could find that

Donaldson reasonably concluded that EPC would not sue over the Air Alert and that the NG Air Alert does not infringe EPC's patent. Donaldson argues that it is now the law of the case that Donaldson has good faith defenses to EPC's infringement claims.

EPC, of course, disputes this interpretation of the effect of the court's summary judgment ruling. EPC points out that this court also held, on summary judgment motions, that EPC has a colorable claim that, in developing the Air Alert, Donaldson willfully infringed EPC's patent. EPC contends that there is no case holding that, just because an accused infringer's defenses survive summary judgment, there can be no finding of willful infringement. Instead, EPC points out that a jury could find all open questions of fact in EPC's favor, thereby establishing all prerequisites for a further finding that Donaldson's infringement of EPC's patents was willful. EPC also points out that the *State Contracting* decision was on appeal of a Rule 50 ruling, and held that, because it was *undisputed* that the defendants in the case actually believed that they had a license to practice the invention, they could not be willful infringers, even in the absence of an opinion of counsel to that effect upon which to rely.

#### 2. Analysis

There are at least two fundamental flaws in Donaldson's motion to exclude evidence on willful infringement. The first is that *Glaros v. H.H. Robertson Co.,* 797 F.2d 1564 (Fed.Cir.1986), *cert. dismissed,* 479 U.S. 1072, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987), a case that Donaldson cited for this very proposition, states the following:

> An order *denying* a motion for partial summary judgment ... is merely a judge's determination that genuine issues of material fact exist. It is not a

judgment, and does not foreclose trial on the issues on which summary judgment was sought. It "does not settle or even tentatively decide anything about the merits of the claim." *Switzerland Cheese Association, Inc. v. E. Horne's Market, Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966). Denial of summary judgment "is strictly a pretrial order that decides only one thing— that the case should go to trial," *id., i.e.,* that the claim *remains pending* for trial. *Glaros,* 797 F.2d at 1573 (emphasis in the original); *see also* Donaldson Company, Inc.'s [sic] Memorandum In Opposition To EPC's Motion In Limine To Preclude Evidence On The Subject Of Obviousness–Type Double Patenting And Motion To Strike Supplemental Expert Reports Of James W. Miller And Jerry Lee Hall (docket no. 243) at 4 (quoting this statement from *Glaros*). The court will explain, *infra,* that this is *ordinarily* the rule, and that there are necessarily exceptions to it. However, this ordinary rules applies in the present circumstances, because Judge Melloy specifically denied summary judgment on Donaldson's equitable defenses and on EPC's claims of infringement and willful infringement *on the basis that there were genuine issues of material fact. See EPC I,* 165 F.Supp. at 844–57 & 880–85. As EPC correctly argues, a jury could decide not only all open questions of fact in EPC's favor, but could also make all credibility determinations, which the court was not allowed to make in ruling on the summary judgment motions, adversely to Donaldson. *See, e.g., Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 285 F.3d 1353, 1362 (Fed.Cir.2002) ("[S]ummary judgment is inappropriate where, as here, a case may ultimately turn on the credibility of witnesses.") (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 244, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Second, another case upon which Donaldson relies, *State Contracting & Engineering Corp. v. Condotte America, Inc.,* 346 F.3d 1057 (Fed.Cir.2003), manifestly does not support the broad contention for which Donaldson cites it. In *State Contracting,* the court noted that the patentee *did not dispute* that the defendants believed that a contract gave them a license to practice the invention recited in two patents. *State Contracting,* 346 F.3d at 1064 (also concluding that the contract could reasonably be construed to grant such a license). It was on the basis of this undisputed fact that the court held that the accused infringers were not required to seek advice of counsel to avoid a finding of willfulness, and upheld the dismissal of the patentee's claim of willful infringement on a Rule 50 motion at trial. *Id.* at 1063–65. The circumstances in *State Contracting* bear no reasonable relationship to the circumstances at issue here, where the pertinent facts are plainly in dispute.

Donaldson's January 9, 2004, Motion To Exclude Any Reference Or Mention Of Willful Infringement At Trial (docket no. 248) will be denied.

### III. MOTIONS RELATED TO DONALDSON'S DEFENSES

Several motions relate to Donaldson's defenses, including obviousness-type double patenting, patent misuse, and separate patentability. The court will consider these issues in turn.

#### A. Viability Of Donaldson's Double–Patenting Defense

#### 1. The pending motions

On November 21, 2003, EPC filed its Motion In Limine To Preclude Evidence On The Subject Of Obviousness–Type Double Patenting And Motion To Strike Supplemental Expert Reports Of James W. Miller And Jerry Lee Hall (docket no. 241). Donaldson resisted that motion on

December 4, 2003 (docket no. 243), and EPC filed its reply in further support of the motion on December 11, 2003 (docket no. 245). Some time later, on February 17, 2004, Donaldson filed its Motion To Amend Answer To Add The Already Allowed Defense Of Double Patenting (docket no. 280). EPC resisted that motion on February 19, 2004 (docket no. 282), and Donaldson filed its reply on February 26, 2004 (docket no. 283). Although EPC tied to the double-patenting issue a challenge to the qualification of two of Donaldson's experts, the court will reserve the question of the qualification of experts for later discussion. For the moment, the court will focus on the issue of the viability of Donaldson's double-patenting defense. In that defense, Donaldson contends that the '456 patent is invalid, owing to obviousness-type double patenting, in light of a later-filed, but earlier-issued patent, U.S. Patent Number 4,368,728 (the '728 patent), by the same inventor, which is also for an air filter restriction indicating device.

### 2. *Arguments of the parties*

EPC, the first party to reopen the arguments concerning the double-patenting issue, asserts that obviousness-type double patenting is a question of law for the court, and more importantly, one that this court has already decided as a matter of law, citing *EPC II*, 225 F.Supp.2d 1069 (N.D.Iowa 2002). Although EPC recognizes that the decision in *EPC II* was procedurally a denial of Donaldson's motion for summary judgment in Donaldson's favor on its double-patenting defense, EPC contends that the ruling did not reserve the issue for trial, but instead disposed of it as a matter of law. EPC contends that this is so, because the decision in *EPC II* construed the relevant claim language in the two patents; identified differences; determined that the proper test to determine whether the two patents are patentably distinct was the so-called "one-way test"; determined that a patentably distinct dependent claim would "save" from invalidation not only itself but the independent claim from which that dependent claim depends (the "composite invention" rule); determined that claims 2 and 3 of the '456 patent would render that patent patentably distinct from the '728 patent when the claims of the '456 patent were treated as a "composite invention"; and analyzed the impact of prior art. EPC points out that, after considering these issues, the court concluded that Donaldson had not established its double-patenting defense as a matter of law. EPC argues that the court's ruling reveals "unequivocally" that no determination in EPC's favor was based upon a disputed issue of fact, so that Donaldson's obviousness-type double-patenting defense has been rejected as a matter of law. EPC argues that "new" prior art, upon which Donaldson's expert now relies, does not require a different result, because that "new" prior art does not involve air filter restriction indicators, much less such indicators with a progressive lock-up mechanism. Indeed, EPC points out that Donaldson has still not identified any factual dispute concerning the supposed defense that requires determination at trial. Consequently, EPC argues that Donaldson's belated motion to plead the affirmative defense upon which it has long professed to rely should be denied, because the amendment is futile, where the defense is without merit.

For its part, Donaldson argues that the court never dismissed Donaldson's double-patenting defense as a matter of law. Moreover, Donaldson contends that an order denying a movant's motion for summary judgment does not preclude that party from asserting the pertinent claim or defense at trial, but instead simply means that fact issues remain, so that the claim or defense should go to trial. Donaldson also points out that EPC has not properly

moved for summary judgment in its favor on the double-patenting defense, and the court could not properly grant summary judgment in EPC's favor without notice or an opportunity to respond. Donaldson argues that EPC's position would turn the court's summary judgment ruling into an unappealable final judgment. Instead of dismissing the defense or barring evidence supporting the defense, Donaldson argues that the court should now allow Donaldson to conform its pleadings to the court's prior ruling by allowing Donaldson to amend its answer so that it expressly pleads the double-patenting defense. Donaldson points out that the court has already applied Rule 15 standards to Donaldson's injection of the defense into this litigation and determined that "justice requires" consideration of Donaldson's double-patenting defense in this case.

### 3. Analysis

As the parties note, this court denied Donaldson's motion for summary judgment on its obviousness-type double-patenting defense after extensive analysis. *See EPC II,* 225 F.Supp.2d at 1082–1131. What is at issue here is not a "reconsideration" of the court's summary judgment ruling, but a determination of the effect of that ruling on the continued viability of the obviousness-type double-patenting defense and what, if any, issues relating to that defense remain for trial. EPC contends that the court has decided all pertinent issues as a matter of law against Donaldson, foreclosing the defense, but Donaldson contends that the court did no more than find that there were genuine issues of material fact on the defense remaining for trial. Analysis of these issues begins with the court's prior ruling and an examination of summary judgment standards.

#### a. The court's prior ruling

##### i. Summary judgment standards. As this court explained in *EPC II,* "[A]s the

plain language of [Rule 56(c)] indicates, the appropriateness of summary judgment *ordinarily* turns on whether or not there are genuine issues of material fact that must be resolved by the trier of fact." *EPC II,* 225 F.Supp.2d at 1088–89 (emphasis added). However, this court also pointed out that "questions of law are particularly amenable to summary judgment precisely because they do not turn on factual disputes." *Id.* at 1089 (citing *Varilease Technology Group, Inc. v. United States,* 289 F.3d 795, 798 (Fed.Cir.2002), and *Gentex Corp. v. Donnelly Corp.,* 69 F.3d 527, 530 (Fed.Cir.1995)). More specifically, this court noted the following:

> Double patenting, which is at issue in Donaldson's motion for summary judgment, is a question of law for the court, *see, e.g., Georgia–Pacific Corp. v. United States Gypsum Co.,* 195 F.3d 1322, 1326 (Fed.Cir.1999), *as amended on denial of rehearing and rehearing en banc,* 204 F.3d 1359 (Fed.Cir. Feb.23, 2000), *cert. denied,* 531 U.S. 816, 121 S.Ct. 54, 148 L.Ed.2d 22 (2000), as is the determination of whether a "one-way" or "two-way" test of double patenting is appropriate. *See In re Emert,* 124 F.3d 1458, 1460 (Fed.Cir.1997). Nevertheless, the legal question of which test of double patenting applies may depend upon specific findings of fact. *See id.* Therefore, this aspect, at least, of Donaldson's motion for summary judgment regarding double patenting may be subject to genuine issues of material fact, notwithstanding that the ultimate questions of what test applies and whether there was double patenting are questions of law. Moreover, other legal determinations in the double-patenting analysis may also be subject to genuine issues of material fact. *Cf. Eli Lilly [ & Co. v. Barr Labs., Inc.],* 251 F.3d [955,] 971–72 [ (Fed.Cir.2001) ] (noting that there were no genuine issues of material

fact as to whether fluoxetine hydrochloride inhibits the uptake of serotonin in animals, or that human is a species of the animal genus, such that the double-patenting issue in that case was "solely a matter of law")[, *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002) ].

*EPC II,* 225 F.Supp.2d at 1089.

Although this court acknowledged that Donaldson's motion for summary judgment on its double-patenting defense *may be* subject to genuine issues of material fact, *see id.,* the court did not identify any such genuine issues of material fact in the remainder of its summary judgment ruling. Rather, as EPC points out, the court conducted the two-step analysis of the obviousness-type double-patenting defense dictated by the Federal Circuit Court of Appeals in *Eli Lilly. Id.* at 1093 (citing *Eli Lilly,* 251 F.3d at 968) & 1093–1131 (explaining and conducting the two steps of the analysis). The precise effect of this ruling on the continued viability of Donaldson's double-patenting defense, however, requires some further examination of the court's specific conclusions.

**ii. *The first step in analysis of the defense.*** In the process of analyzing Donaldson's motion for summary judgment on the double-patenting defense, the court first construed the claims of the '456 patent and the '728 patent *as a matter of law. See id.* at 1094–1100 & 1094 ("[A]s the first step in the analysis of obviousness-type double patenting, 'as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences.' ") (quoting *Eli Lilly,* 251 F.3d at 968). The court summarized its conclusions on the first step of the analysis as follows:

[C]laims 1, 2, and 3 of the '456 patent combine a progressive air filter restriction indicating device, as claimed in claim 1, with a "guiding means" as claimed in claims 2 (means-plus-function) and 3 (specific structure), while claim 1 of the '728 patent combines a progressive air filter restriction indicating device with a "novel reset structure." Thus, the claims of the '456 patent might be described as claiming $a + b$, where a is the progressive air filter restriction indicating device claimed in independent claim 1 and b is the guiding means claimed in dependent claims 2 and 3. On the other hand, claim 1 of the '728 patent might be described as claiming $a + c$ in a single independent claim, where a is, again, the progressive air filter restriction indicating device, but c is the "novel reset structure." However, neither patent involves a combination of both of these subcombinations, that is $a + b + c$. *Compare In re Braat,* 937 F.2d [589,] 593 [ (Fed.Cir.1991) ] (each patent involved combination/subcombinations, and one of the patents included additional claims combining the two subcombinations).

*EPC II,* 225 F.Supp.2d at 1100. Thus, this portion of the court's analysis determined claim construction as it related to the double-patenting defense *as a matter of law,* and must, at the very least, be deemed the law of the case on that issue.

**iii. *The second step in analysis of the defense.*** Turning to the second step in the analysis, determination of whether or not there were "patentable distinctions," *id.* (" 'Having recognized the difference between the claims at issue, [the court] must decide whether this difference renders the claims patentably distinct.' ") (quoting *Eli Lilly,* 251 F.3d at 969), the court considered whether a "one-way test" or a "two-way test" was applicable. *Id.* at 1100–1111. What test is applicable, again, is a question of law for the court, albeit one that might be subject to genuine issues of material fact. *Id.* at 1089. In the process of determining what test applies

here, the court found that "there is, *or may be*, a genuine issue of fact as to whether or not the inventor of both patents could have included both sets of claims in a single application," *id.* at 1110, but concluded that this genuine issue of fact was not "material," because it affected only one of the two sequential preconditions for application of the two-way test. *Id.* at 1110 (emphasis added). The court then determined that "there is no genuine issue of material fact that the 'control test' requires application of the one-way test to the question of whether the two patents are patentably distinct in the circumstances presented here ... because the [Patent and Trademark Office (PTO)] is *not* 'solely responsible for the delay in causing the second-filed application [for the '728 patent].' " *Id.* at 1110–1111 (quoting *In re Berg,* 140 F.3d at 1437) (emphasis in the original). Thus, even though the court had previously acknowledged, hypothetically, that determination of which test would be applicable might be subject to genuine issues of material fact, *see id.* at 1089, the court determined *in this case,* "as a matter of law, that only the one-way test is applicable to the question of whether the '456 patent is patentably distinct from, or is instead only an obvious variation of, the earlier-issued '728 patent." *Id.* at 1111.

Continuing with the second step of the analysis, the court considered whether the two patents at issue are "patentably distinct" under the applicable one-way test. *See id.* at 1111–1131. The court summarized its conclusions on the second step of the analysis of the obviousness-type double-patenting defense, as follows:

> The court concludes that claim 1 of the '728 patent does not claim any "guiding means," either in means-plus-function form or in terms of specific structures, that performs the "guiding function" of guiding the indicating member as the diaphragm moves between its infold and outfold positions. The court concludes, further, that neither of the "prior art" patents upon which Donaldson relies demonstrates that the '456 patent should be invalidated for obviousness-type double patenting over the '728 patent. This is so, because neither the '457 patent nor the '733 patent claims, either expressly or inherently, in either means-plus-function form or in the form of specific structure, any "guiding means" consisting of the interaction of a cylindrical or tubular member closely slidably disposed within a bore or hub, as claimed in claims 2 and 3 of the '456 patent, to perform the "guiding function" specified in the '456 patent. Moreover, the prior art upon which Donaldson relies simply does not provide any bridge or connection between the claims of the '728 patent and the '456 patent such that the prior art demonstrates that the '456 patent is only an obvious variation of the invention claimed in the '728 patent. *Donaldson has, therefore, failed to prove as a matter of law that claims 2 and 3 of the '456 patent are separately invalid for obviousness-type double patenting over the '728 patent, or that the "composite invention" of claims 1, 2, and 3 of the '456 patent is invalid for obviousness-type double patenting over claim 1 of the '728 patent. Donaldson's motion asserting the invalidity of the '456 patent for obviousness-type double patenting will, therefore, be denied.*

*EPC II,* 225 F.Supp.2d at 1130–31 (emphasis added). Thus, this portion of the ruling also made certain determinations *as a matter of law,* and concluded that Donaldson had *failed* to establish, as a matter of law, its double-patenting defense. It is also worth noting that, although this court acknowledged in its statement of summary judgment standards that "other legal determinations in the double-patenting anal-

ysis may also be subject to genuine issues of material fact," *id.* at 1089, this court actually found no such genuine issues of material fact in this case.

#### b. Effect of the summary judgment ruling

 *i. Viability of the defense.* Donaldson nevertheless contends that this court's denial of its motion for summary judgment on its double-patenting defense is no more than " 'a judge's determination that genuine issues of material fact exist.' " Donaldson Company, Inc.'s [sic] Memorandum In Opposition To EPC's Motion In Limine To Preclude Evidence On The Subject Of Obviousness–Type Double Patenting And Motion To Strike Supplemental Expert Reports Of James W. Miller And Jerry Lee Hall (docket no. 243) at 4 (quoting *Glaros v. H.H. Robertson Co.,* 797 F.2d 1564, 1573 (Fed.Cir.1986)). While this "rule" may *ordinarily* apply, as this court explained in *EPC II,* "questions of law are particularly amenable to summary judgment precisely because they do not turn on factual disputes." *EPC II,* 225 F.Supp.2d at 1089 (citing *Varilease Technology Group, Inc. v. United States,* 289 F.3d 795, 798 (Fed.Cir.2002), and *Gentex Corp. v. Donnelly Corp.,* 69 F.3d 527, 530 (Fed.Cir. 1995)). The ruling at issue here clearly cannot be construed as determining that any genuine issues of material fact existed, where the court made several determinations *on questions of law* and identified no genuine issues of material fact as the basis for denying Donaldson's motion for summary judgment.

Nevertheless, EPC's argument that this court *necessarily* foreclosed Donaldson's ability to assert the double-patenting defense at trial is equally wrong-headed. EPC did not move for summary judgment on the defense, and the court ultimately held *only* that Donaldson had not *established* the defense as a matter of law. *See id.* at 1130–31. Notwithstanding Donald-son's failure to point to genuine issues of material fact, this court cannot now draw the negative inference that Donaldson *cannot* establish, or even offer evidence in support of, its double-patenting defense from Donaldson's failure to establish the defense as a matter of law based on the evidence then in the record. Had EPC wished to foreclose Donaldson's ability to rely on the defense altogether, EPC should have moved for summary judgment in its favor on the *inapplicability* of the defense.

Even so, certain issues relating to the double-patenting defense were determined as a matter of law in *EPC II* and, thus, are the law of the case. Those issues, stated generally, are the following: (1) the construction of the claims of the '456 patent and the '728 patent, including the determination of differences, *see id.* at 1094–1100; (2) the applicability of the one-way test in this case to determine whether the patents are patentably distinct, *see id.* at 1100–1111; and (3) the determination that neither of the "prior art" patents upon which Donaldson had so far relied, identified as the '457 patent and the '733 patent, demonstrates that the '456 patent should be invalidated for obviousness-type double patenting over the '728 patent, because that prior art does not provide any bridge or connection between the claims of the '728 patent and the '456 patent sufficient to demonstrate that the '456 patent is only an obvious variation of the invention claimed in the '728 patent. *See id.* at 1111–1131. Therefore, for Donaldson to prevail at trial on its double-patenting defense, it will have to rely on evidence not already found inadequate under the applicable claim constructions and legal standards.

 EPC asserts that the "new" prior art upon which Donaldson's expert now intends to rely at trial—consisting of the FilterLife Gauge (based on the '457

and '733 patents) and patents sufficiently identified for present purposes as the '338, '913, and '584 patents—simply is insufficient as a matter of law to "bridge the gap" between the '728 and the '456 patents so as to invalidate the '456 patent for obviousness-type double patenting. In the present context of pre-trial motions regarding admissibility of evidence, this argument is essentially a "relevance" argument pursuant to Rule 401 of the Federal Rules of Evidence. However, what EPC is really asking the court to do is to make an abbreviated, pseudo-summary-judgment-like application of the double-patenting analysis in light of additional evidence. The court declines to make the further determinations that EPC requests. Rather, the double-patenting defense will be tried to the court, because it is a question of law, *see id.* at 1089 ("Double patenting ... is a question of law for the court.") (citing *Georgia–Pacific Corp. v. United States Gypsum Co.,* 195 F.3d 1322, 1326 (Fed.Cir.1999)), and in the course of that determination, the court will necessarily determine the "relevance" of the "new" prior art, *i.e.,* whether it is sufficient to establish the double-patenting defense, in a fully-developed context. EPC will not be prejudiced by this approach, because the court will avoid any confusion about which issues are for the jury to decide, and which are for the court, by trying the double-patenting defense to the court without the jury present, either by taking pertinent witnesses after the jury is done for the day or after the submission of evidence to the jury is completed, or by deciding the issue on written submissions.

Therefore, EPC's motion to preclude evidence on Donaldson's obviousness-type double-patenting defense will be denied, with the caveat that any such evidence will be submitted to the court, not to the jury.

*ii. Impact on the motion for leave to amend.* The determinations above are also dispositive of Donaldson's belated motion for leave to amend its answer to plead, expressly, its obviousness-type double-patenting defense. In *EPC II,* this court conducted a Rule 15 analysis of what the court construed to be a request for leave to assert a "new" defense, either for the first time or by way of clarification. *See id.* at 1083–86. Following that analysis, the court concluded that " 'justice ... requires' consideration of Donaldson's belated summary judgment motion asserting the defense of double patenting." *Id.* at 1086. The court now concludes that the proffered amendment to assert the defense is not "futile," as EPC contends, where the ruling in *EPC II* did *not* foreclose the defense, and the court declines to determine pre-trial whether or not additional prior art upon which Donaldson now intends to rely is sufficient to establish the defense.

Therefore, Donaldson's motion to amend its answer to add its double-patenting defense will be granted.

### B. Patent Misuse

The next motion relating to Donaldson's defenses is EPC's March 26, 2004, Motion In Limine To Exclude The Defense Of Patent Misuse (docket no. 316). Donaldson resisted this motion on April 2, 2004 (docket no. 334), and EPC filed a reply on April 8, 2004 (docket no. 341).

### 1. Arguments of the parties

EPC contends that, although the court allowed Donaldson to amend its answer to assert a defense of patent misuse, it is now clear that the defense lacks merit as a matter of law. This is so, EPC argues, because there is no evidence of marketplace activity by EPC that broadens the term of the '456 patent, or that such broadening had an anticompetitive effect. EPC argues that Donaldson cannot prevail on a patent misuse defense based on EPC

obtaining a five-year contract with Delphi/GM to supply indicators when there was less than a year left in the term of the '456 patent, because there is no connection between the '456 patent and the Delphi contract. Instead, EPC argues that it is undisputed that Delphi switched the contract from Donaldson to EPC, because of Donaldson's continuing quality control problems. EPC also argues that it did not receive any royalties after the patent expired, because Delphi is free to terminate the contract "at any time and for any reason." Finally, EPC contends that its claim for price erosion beyond the termination of the patent term is not patent misuse, because its argument is that Donaldson's infringing activity suppressed the price on the Delphi contract before the patent expired. Moreover, EPC argues that a damages theory presented in litigation can never constitute patent misuse.

Donaldson asserts that EPC's motion is an improper Rule 56 summary judgment motion on the eve of trial intended to prevent Donaldson from exercising the full time that it would have had to resist a proper summary judgment motion. Donaldson also contends that the motion should be denied for failure to comply with the local rules for a summary judgment motion. As to the merits of the motion, Donaldson contends that there is credible evidence that EPC illegally expanded the scope of its patent protection in two ways: (1) EPC secured an agreement with Delphi allowing Delphi to practice the patent beyond the expiration date; and (2) EPC continued to mark its products with two patent numbers after those patents had expired. Both of these activities, Donaldson contends, had the requisite anticompetitive effect to support a patent misuse defense and are supported by sufficient evidence to be presented to a jury.

In reply, EPC argues, first, that the Delphi contract provides no evidence of improper extension of the patent term, because a contract to purchase patented items for a term during which the patent expires does not improperly extend the term of the patent or impose a "royalty." Moreover, EPC reiterates its argument that EPC got the Delphi contract because of Donaldson's quality control problems, not because of EPC's "use" or "misuse" of its patent. EPC also argues that Donaldson's "surprise" patent mismarking claim is a separate cause of action under 35 U.S.C. § 292, which Donaldson has not pleaded, and Donaldson has cited no authority that mismarking constitutes "patent misuse," so that the evidence is irrelevant to Donaldson's "patent misuse" defense.

### 2. Analysis

#### a. Patent misuse

■ The Federal Circuit Court of Appeals has summarized the defense of patent misuse as follows:

The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage. Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703–04, 24 USPQ2d 1173, 1176 (Fed.Cir. 1992) ("The concept of patent misuse arose to restrain practices that did not in themselves violate any law, but that draw anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy.")

Patent misuse is viewed as a broader wrong than antitrust violation because of the economic power that may be derived from the patentee's right to exclude.

Thus misuse may arise when the conditions of antitrust violation are not met. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 140–41, 89 S.Ct. 1562, 23 L.Ed.2d 129, 161 USPQ 577, 597 (1969). The key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect. *See Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 868, 45 USPQ2d 1225, 1231–32 (Fed.Cir. 1997); *B. Braun Medical, Inc. v. Abbott Labs.,* 124 F.3d 1419, 1426, 43 USPQ2d 1896, 1902 (Fed.Cir.1997); *Mallinckrodt,* 976 F.2d at 704, 24 USPQ2d at 1176.

* * * Patent misuse arises in equity, and a holding of misuse renders the patent unenforceable until the misuse is purged; it does not, of itself, invalidate the patent. *See Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661, 668 n. 10, 231 USPQ 363, 368 n. 10 (Fed.Cir.1986)....

* * * Although the defense of patent misuse indeed evolved to protect against "wrongful" use of patents, the catalog of practices labelled "patent misuse" does not include a general notion of "wrongful" use. *See [USM Corp. v. SPS Techs., Inc.,* 694 F.2d 505, 510, 216 USPQ 959, 963 (7th Cir.1982) ] ("in application, the doctrine has largely been confined to a handful of specific practices")[, *cert. denied,* 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983) ].

*C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1372–73 (Fed.Cir.1998), *cert. denied,* 526 U.S. 1130, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999); *Virginia Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 868 (Fed.Cir. 1997) ("Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of · which requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect.") (internal citations and quotation marks omitted), *cert. denied,* 525 U.S. 815, 119 S.Ct. 52, 142 L.Ed.2d 40 (1998).

The Federal Circuit Court of Appeals has also distinguished between *per se* patent misuse, conduct excluded by statute from the definition of patent misuse, and other conduct that may constitute patent misuse, as follows:

The courts have identified certain specific practices as constituting *per se* patent misuse, including so-called "tying" arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, *see, e.g., Morton Salt Co.,* 314 U.S. at 491, 62 S.Ct. at 404, 86 L.Ed. 363, 52 USPQ 30, 33, and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties, *see, e.g., Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99, 143 USPQ 264, 266 (1964). Congress, however, has established that other specific practices may not support a finding of patent misuse. *See* 35 U.S.C. § 271(d) (1994); *Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 202, 100 S.Ct. 2601, 2616, 65 L.Ed.2d 696, 206 USPQ 385, 399 (1980) (construing earlier version of § 271(d)). A 1988 amendment to § 271(d) provides that, *inter alia,* in the absence of market power, even a tying arrangement does not constitute patent misuse. *See* 35 U.S.C. § 271(d)(5) (1994) (added by Pub.L. No. 100–703, § 201, 102 Stat. 4676 (1988)).

When a practice alleged to constitute patent misuse is neither *per se* patent misuse nor specifically excluded from a misuse analysis by § 271(d), a court must determine if that practice is "reasonably within the patent grant, *i.e.,* that

it relates to subject matter within the scope of the patent claims." *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 708, 24 USPQ2d 1173, 1179–80 (Fed.Cir.1992). If so, the practice does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse. *Id.,* 976 F.2d at 708, 24 USPQ2d at 1180. If, on the other hand, the practice has the effect of extending the patentee's statutory rights and does so with an anticompetitive effect, that practice must then be analyzed in accordance with the "rule of reason." *Id.* Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) (citing *Arizona v. Maricopa County Med. Soc.,* 457 U.S. 332, 343 & n. 13, 102 S.Ct. 2466, 2472 & n. 13, 73 L.Ed.2d 48 (1982)). *Virginia Panel Corp.,* 133 F.3d at 869. EPC contends that there is no evidence of cognizable patent misuse under these standards, while Donaldson contends that there is.

### b. *Propriety of pre-trial determination*

 The court concludes that EPC's motion to exclude the defense of patent misuse is not really a pre-trial motion on the admissibility of evidence, but instead asks the court to make another abbreviated, pseudo-summary-judgment-like determination, this time on the viability of the patent misuse defense. EPC would certainly be entitled to move for judgment as a matter of law in its favor on that defense *after presentation of the evi-*

*dence at trial,* on the ground that the defense is not supported by sufficient evidence to be submitted to a jury. *See* Fed. R. Civ. P. 50(a)(1) & (2). However, having missed the opportunity to move for summary judgment on the defense pre-trial, EPC should not now be allowed to exclude the defense as a matter of law on abbreviated, summary-judgment-like submissions.

Nevertheless, the court does find that it can place certain limits on the evidence in support of the defense. Donaldson has now asserted that its defense is supportable as to only two alleged incidents of "misuse" of the '456 patent: (1) EPC's agreement with Delphi, which purportedly allows Delphi to practice the patent beyond the expiration date; and (2) EPC's continuing to mark its products with two patent numbers after those patents have expired. Thus, Donaldson is now estopped to assert a patent misuse defense on any other basis, such as EPC's assertion of a price erosion theory of damages in this action.

Although the court will deny EPC's motion to exclude evidence on the two claims of patent misuse that Donaldson now asserts, the court has considerable doubt that those claims of patent misuse, at least as presently formulated and supported, are submissible. The court observes that Donaldson's first claim of patent misuse is premised on a "post-expiration royalties" theory authorized by *Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964). *See Virginia Panel Corp.,* 133 F.3d at 869 (recognizing as *per se* patent misuse "arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties," citing *Brulotte,* 379 U.S. at 33, 85 S.Ct. 176). In *Brulotte,* the Supreme Court addressed a claim that the patentee had licensed its patented devices for a period beyond the term of the patents and had demanded a

royalty payment throughout the term of the license. The Court concluded, "[T]o use [patent] leverage to project . . . royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tieing [sic] the sale or use of the patented article to the purchase or use of unpatented ones." *Brulotte*, 379 U.S. at 33, 85 S.Ct. 176. Donaldson contends that EPC has likewise granted Delphi a "license" to practice EPC's patent beyond the term of the patent, and has demanded a "royalty" in exchange. The court is not convinced that the evidence on which Donaldson relies for such a claim will ultimately support it.

Donaldson relies on the following provision of the Delphi/EPC contract in support of its "post-expiration royalties" claim:

14. INTELLECTUAL PROPERTY Seller [EPC] agrees: (a) to defend, hold harmless and indemnify Buyer [Delphi], its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services. Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization and (d) to the extent that this contract is issued for the creation of copyrightable words, the works shall be considered "works made for hire" to the extent that the works do not qualify as "works made for hire." Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

Affidavit of Cyrus A. Morton (docket no. 321), Exhibit F, p. 3, ¶ 14. The court doubts that this provision can possibly be construed to be the grant of a license demanding royalty payments beyond the term of the patent. Subclause (a) demands from the Seller protection of the Buyer against patent infringement claims *by a third party;* it is not a grant of a license on the Seller's patents. Subclauses (c) and (d) likewise are not "licensing" provisions, at least, not ones that grant the Buyer a license in the Seller's patents. Thus, Donaldson's argument would have to hang by the tenuous thread that subclause (b) grants the "Buyer" a license to practice the "Seller's invention." However, even supposing that subclause (b) grants a "license," *that subclause specifically makes the grant without requiring a royalty.*

The court believes that Donaldson's patent misuse claim premised on marking of a device with expired patents is equally weak, but this time, on evidentiary grounds. Donaldson contends that, on April 1, 2004, an employee of Donaldson "stopped by a GM car dealership in Bloomington, Minnesota and purchased a Filter Minder manufactured by EPC"; that the Filter Minder was marked with both the '728 patent and the '456 patent, but that both patents expired in 2001; and that the Filter Minder was marked with the same GM part number that is the subject of the Delphi/EPC contract. *See* Donaldson's Memorandum Of Law In Opposition To EPC's Motion In Limine To Exclude The Defense Of Patent Misuse (docket no. 334) at 7. Donaldson contends that continuing to mark a product with expired patent numbers violates 35 U.S.C.

§ 292, citing *Arcadia Machine & Tool, Inc. v. Sturm, Ruger & Co.*, 786 F.2d 1124, 1125 (Fed.Cir.1986), which the court does not dispute. However, the court finds that the *evidentiary* deficiency with this claim of patent misuse is that there is absolutely no evidence thus far cited by Donaldson to establish that the Filter Minder that its employee purchased in April 2004 was manufactured *after* the '728 and '456 patents expired. Plainly, a replacement part in inventory at a GM dealership could have been on the shelf for a considerable time. Moreover, EPC is correct in its assertion that Donaldson has cited no authority that patent mismarking is cognizable as "patent misuse," rather than a separate claim under 35 U.S.C. § 292, which has not been pleaded in this case.

Consequently, the court will deny EPC's motion to exclude before trial all evidence of patent misuse, but limit such evidence to the two incidences of "misuse" upon which Donaldson now relies. Moreover, the court finds that the evidence so far identified in the record as supporting the patent misuse defense is remarkably weak, and may not ultimately support submission of the defense to the jury.

### C. Separate Patentability

The final motion addressed to Donaldson's defenses is EPC's March 26, 2004, Motion In Limine To Preclude Donaldson From Presenting Any Theory Of Non-Infringement Based On Separate Patentability (docket no. 317). Donaldson resisted that motion on April 2, 2004 (docket no. 335), and EPC filed a reply on April 8, 2004 (docket no. 340). At issue in this motion is evidence of Donaldson's U.S. Patent No. 6,604,486 B1 (the Krisko patent, *supra* ),[4] which both parties assert is related to Donaldson's NG Air Alert.

### 1. Arguments of the parties

In this motion, EPC argues that the Krisko patent and any reference to it should be excluded pursuant to Rules 402 and 403 of the Federal Rules of Evidence for purposes of proving that Donaldson's NG Air Alert does not infringe EPC's '456 patent under the doctrine of equivalents. EPC contends that Donaldson has conceded that separate patentability is not relevant to literal infringement. EPC contends that the Krisko patent is irrelevant to the infringement analysis, because, from the claims and file history of the Krisko patent, it is clear that there is no logical nexus between the disputed issues—*i.e.*, whether or not the "locking fingers" of the NG Air Alert are substantially different from the "elongated locking member" of the '456 patent—and the examiner's analysis of the patentability of the Krisko patent. Moreover, EPC contends that introduction of evidence of the Krisko patent will only serve to confuse the jury into believing that the patent gives Donaldson the right to make the NG Air Alert, when all a patent gives the holder is the right *to exclude others* from practicing the invention. EPC contends that there is even more reason to exclude this evidence on grounds of confusion, where the examiner did not address the differences between the Krisko patent and the '456 patent that are at issue here. Finally, EPC contends that evidence of the Krisko patent should be excluded, because of Donaldson's fraud upon the PTO in making inadequate disclosures of the '456 patent and the present litigation in the prosecution of the Krisko patent.

Donaldson counters, first, that separate patentability is relevant to *both* literal in-

---

4. The court will refer to this patent consistently as "the Krisko patent" rather than "the '486 patent" to avoid the sort of confusion that is sometimes apparent in the parties' briefing, in which there are various references to "the '456 patent" when "the '486 patent" is clearly intended, and vice versa.

fringement and infringement under the doctrine of equivalents. Moreover, Donaldson argues that the examiner was informed of the '456 patent during the course of the prosecution of the Krisko patent, considered that patent, and nevertheless concluded that the Krisko patent was novel and non-obvious. This indication of "substantial differences," Donaldson argues, is relevant to infringement. Moreover, Donaldson argues that the Krisko patent is presumed valid and that EPC is making only unsupported allegations of inequitable conduct. Contrary to EPC's contentions, Donaldson argues that the '456 patent and the present litigation were fully disclosed to the examiner in the course of prosecution of the Krisko patent.

In reply, EPC argues that separate patentability does not apply to literal infringement in this case, because the cases cited by Donaldson do not stand for that proposition, and the argument would only have merit if Donaldson's "reset button" performed some different function from the claimed function of "the button" in the '456 patent. EPC also argues that Donaldson's disclosure of the '456 patent to the examiner during prosecution of the Krisko patent misrepresented the '456 patent in a "litigation driven" way. EPC also argues that it would be wrong to allow Donaldson to benefit from its failure to make a proper disclosure of the '456 patent during prosecution of the Krisko patent.

### 2. Analysis

#### a. Separate patentability

The court agrees with the parties that the seminal discussion of "separate patentability," in the sense intended here, can be found in *Atlas Powder Co. v. E.I. du Pont De Nemours,* 750 F.2d 1569 (Fed.Cir. 1984):

> Du Pont argues that, because its emulsion product was patented after the '978 patent issued, its product avoids infringement by equivalence. According to Du Pont, *"so long as direct infringement is lacking,* the grant of a patent to an accused infringer constitutes a prima facie determination of nonequivalence and, accordingly, of non-infringement" (Du Pont's emphasis). Atlas disagrees. So do we.

> Du Pont concedes that, if Atlas patents A + B + C and Du Pont then patents the improvement A + B + C + D, Du Pont is liable to Atlas for any manufacture, use, or sale of A + B + C + D because the latter directly infringes claims to A + B + C. Du Pont urges, however, that it is not liable for manufacture, use, or sale of patented improvement A + B + C', even though A + B + C' is "equivalent" to A + B + C. We reject Du Pont's attempted distinction. Whether Du Pont makes A + B + C + D or A + B + C', Du Pont has used the gist of Atlas' invention to devise a patentable composition. There is no compelling reason to hold Du Pont liable for infringement in one instance but not the other.

> We agree with *Bendix Corp. v. United States,* 199 USPQ 203 (Ct.Cl.1978), *aff'd,* 600 F.2d 1364, 220 Ct.Cl. 507, 204 USPQ 617 (1979). There the trial judge said that where defendant has appropriated the material features of the patent in suit, infringement will be found "even when those features have been supplemented and modified to such an extent that the defendant may be entitled to a patent for the improvement." 199 USPQ at 221–22, 1978 WL 21437. Though Du Pont argues that cases from other courts support a contrary result, we are not bound by those cases and in any event find them unpersuasive.

> More persuasive is the reasoning of *Herman v. Youngstown Car Mfg. Co.,* 191 F. 579, 584–85, 112 CCA 185 (6th Cir.1911). After finding equivalence,

the court rejected appellant's contention that its receipt of a patent negates infringement:

> A patent is not the grant of a right to make or use or sell. It does not, directly or indirectly, imply any such right. It grants only the right to exclude others. The supposition that a right to make is created by the patent grant is obviously inconsistent with the established distinctions between generic and specific patents, and with the well-known fact that a very considerable portion of the patents granted are in a field covered by a former relatively generic or basic patent, are tributary to such earlier patent, and cannot be practiced unless by license thereunder.

> Another reason sometimes advanced for supposing that the structure of the second does not infringe the claim of the first patent is that the Patent Office has declared that a patentable difference exists. The premise is sound, but not the conclusion. In examining the second application, the Patent Office has no concern with the scope of the claim of the first, and does not and must not pay any attention thereto. It is concerned only with the early disclosure by the specification and drawings. Patentable difference does not of itself tend to negative infringement. It may just as well be based upon infringement, plus improvement; and improvement may lie in addition, simplification, or variance.

*See also Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 43, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929) (where there is substantiality of function, way, and result, infringement cannot be avoided by any presumptive validity attaching to the issuance of a patent to the infringer); *Sure Plus Mfg. Co. v. Kobrin,* 719 F.2d 1114, 1117 (11th Cir.1983) (no presumption of non-infringement arises from the issuance of a patent to the infringer); *Freeman v. Altvater,* 66 F.2d 506, 512, 18 USPQ 186, 192–93 (8th Cir.), *cert. denied,* 290 U.S. 696, 54 S.Ct. 132, 78 L.Ed. 598 (1933) (the court after finding equivalence stated that the issuance of a patent merely raises a presumption of validity, not a presumption of non-infringement).

*Atlas Powder Co.,* 750 F.2d at 1580–81 (footnotes omitted).

A more recent, and more succinct, statement of the relevance of "separate patentability" is the following:

> West Bend argues that its vegetable slicing device can not be equivalent to Presto's patented invention, as a matter of law, because West Bend obtained its own patent on its device. West Bend stresses that the patent examiner cited Presto's '286 patent as prior art, when granting a patent to West Bend.

> The grant of a separate patent on the accused device does not automatically avoid infringement, either literal or by equivalency. Improvements or modifications may indeed be separately patentable if the requirements of patentability are met, yet the device may or may not avoid infringement of the prior patent. *See, e.g., Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1580–81, 224 USPQ 409, 417 (Fed.Cir.1984) (improvement in a step of a patented process, although separately patentable, did not avoid infringement under the doctrine of equivalents). Whether a modified device is within the scope of the prior patent, literally or by equivalency, depends on the particular facts. The fact of separate patentability is relevant, and is entitled to due weight. However, West Bend's statement that there can not be infringement as a matter of law is incorrect.

Presto states that only the first page of the West Bend patent was of record at trial, and that West Bend presented no evidence concerning the subject matter of its patent. Such evidence when present warrants consideration by the trier of fact, along with the other evidence of the differences and similarities of the patented and accused devices. *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1191–92 (Fed.Cir.1996).

■ In short then, "[t]he nonobviousness of the accused device, evidenced by the grant of a United States patent, is relevant to the issue of whether the change therein is substantial." *Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1570 (Fed.Cir. 1996). Nevertheless, "[t]he fact of separate patentability presents no legal or evidentiary presumption of noninfringement." *Hoechst Celanese Corp. v. BP Chems., Ltd.,* 78 F.3d 1575, 1582 (Fed.Cir.), *cert. denied,* 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996). To put it another way, "it is well established that separate patentability does not avoid equivalency as a matter of law." *Fiskars, Inc. v. Hunt Mfg. Co.,* 221 F.3d 1318, 1324 (Fed.Cir. 2000) (citing *Atlas Powder Co.,* 750 F.2d at 1580), *cert. denied,* 532 U.S. 972, 121 S.Ct. 1603, 149 L.Ed.2d 469 (2001). Therefore, a court may properly exclude evidence of separate patentability on the question of equivalence on relevance or other grounds. *Id.* Nor does such evidence necessarily outweigh substantial evidence supporting a finding of infringement. *Hoechst Celanese Corp.,* 78 F.3d at 1582.

Recognizing that the court may exclude evidence of separate patentability on relevance or other grounds, *see Fiskars, Inc.,* 221 F.3d at 1324, the court will consider the relevance of the proffered evidence of separate patentability of the Krisko patent to questions at issue in this litigation, as well as whether any relevance of that evidence is outweighed by other considerations of admissibility.

### b. Relevance to literal infringement

■ First, the court must settle the disputed question of whether evidence of "separate patentability" is relevant to *both* literal infringement and infringement under the doctrine of equivalents, or only to the latter. Donaldson argues that "separate patentability" is relevant to both literal infringement and infringement under the doctrine of equivalents. For this proposition, Donaldson relies primarily on *Giese v. Pierce Chem. Co.,* 43 F.Supp.2d 98, 111 n. 13 (D.Mass.1999) ("Patentable separateness is relevant to the infringement inquiry in that it is a factor to be considered when comparing the accused device to the plaintiff's device under the doctrine of literal infringement or the doctrine of equivalents. *See, e.g., Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1570 (Fed. Cir.1996); *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1192 (Fed. Cir.1996) (noting that in the infringement inquiry, '[t]he fact of separate patentability is relevant, and is entitled to due weight.')."). The main problem with this contention is that neither of the cases cited in *Giese* stands for the proposition that "separate patentability" is relevant to literal infringement. Rather, in both *Zygo Corporation* and *National Presto Industries,* the court discussed "separate patentability" only in connection with its discussion of infringement under the doctrine of equivalents. *See Zygo Corp.,* 79 F.3d at 1568–70; *National Presto Indus., Inc.,* 76 F.3d at 1190–91.

This court finds more persuasive Donaldson's argument that separate patentability is relevant to literal infringement *of a means-plus-function claim,* because literal infringement of such a claim does involve the question of "equivalent" struc-

**1002**

tures, and hence "substantial" or "insubstantial" differences in the structure of the accused device. *See Lockheed Martin Corp.*, 324 F.3d at 1320 ("Literal infringement of a § 112 ¶ 6 claim requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical *or equivalent* to the corresponding structure in the specification.") (emphasis added); 35 U.S.C. § 112, ¶ 6 (a claim "shall be construed to cover the corresponding structure, material, or acts described in the specification *and equivalents thereof* ") (emphasis added). Therefore, the court concludes that separate patentability is at least generally relevant to both literal and doctrine of equivalents infringement of a means-plus-function claim, and to doctrine of equivalents infringement of other claims.

#### c. Relevance of the proffered evidence of separate patentability

Notwithstanding such general relevance of "separate patentabiliy," EPC makes several arguments that evidence of the Krisko patent is not relevant under Rule 401 of the Federal Rules of Evidence to the question of infringement of the '456 patent, and therefore, evidence of that patent should be excluded pursuant to Rule 402 of the Federal Rules of Evidence. *See* FED. R. EVID. 402 ("Evidence which is not relevant is not admissible."). This is so, EPC contends, because nothing in the prosecution of the Krisko patent can be deemed to place the imprimatur of the PTO on any supposed "substantial differences" between the Krisko patent and the '456 patent, where the corresponding claims were either not at issue in the prosecution of the Krisko patent, or the pertinent claims of the '456 was not properly brought to the attention of, or considered by, the examiner in the course of his evaluation of the Krisko patent application.

The court agrees with EPC that these factors have some support in the record

and necessarily go a considerable way toward demonstrating that the Krisko patent really suggests very little about whether there are "substantial differences" between the NG Air Alert and the '456 patent. However, the court concludes that these factors go to the *weight*, not the *admissibility*, of the evidence of separate patentability. *Cf. National Presto Indus., Inc.*, 76 F.3d at 1192 ("Presto states that only the first page of the West Bend patent was of record at trial, and that West Bend presented no evidence concerning the subject matter of its patent. Such evidence when present warrants consideration by the trier of fact, along with the other evidence of the differences and similarities of the patented and accused devices."). Therefore, the court will not exclude evidence of the Krisko patent on the ground of irrelevance.

#### d. Admissibility of the evidence of separate patentability

EPC argues that, even if Donaldson's evidence of separate patentability is relevant to questions presented in this case, it should still be excluded pursuant to Rule 403 of the Federal Rules of Evidence, on the ground that it is likely to confuse the jury into believing that the patent gives Donaldson the right to make the NG Air Alert, when all a patent gives the holder is the right *to exclude others* from practicing the invention. *See* FED. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by ... confusion of the issues."). As EPC points out, in *Atlas Powder Company*, the Federal Circuit Court of Appeals reiterated the observation by the Sixth Circuit Court of Appeals that " '[a] patent is not the grant of a right to make or use or sell. It does not, directly or indirectly, imply any such right. It grants only the right to exclude others.' " *Atlas Powder Co.*, 750 F.2d at 1580 (quoting

*Herman,* 191 F. at 584–85). Nevertheless, the court concludes that the cure for any potential confusion here is not the exclusion of the evidence of separate patentability, but proper instruction of the jury as to the import of evidence of separate patentability.

Therefore, EPC's motion to exclude evidence of separate patentability will be denied.

## IV. EXPERTS

Several of the parties' pre-trial motions relate to the qualification of experts, the reliability of their opinions on certain issues, and the timeliness of disclosures of their identities, opinions, and reports. These motions consist of the following: (1) the reserved portion of EPC's November 21, 2003, Motion To Strike Supplemental Expert Reports Of James W. Miller And Jerry Lee Hall (docket no. 241); (2) EPC's January 9, 2004, Motion In Limine To Preclude The Testimony Of James W. Miller (docket no. 252); (3) Donaldson's January 9, 2004, Motion In Limine To Exclude Unreliable Expert Opinion On Lost Profits Under Rule 702 Of The Federal Rules Of Evidence (docket no. 263); (4) Donaldson's March 26, 2004, Motion In Limine To Exclude Bruce Burton's March 1, 2004, Expert Report And Other Untimely Expert Disclosures (docket no. 320); and finally, (5) EPC's March 31, 2004, Motion To Strike Affidavit Of James F. Nieberding And To Preclude Testimony Of Any New Economic Expert (docket no. 326). The court will consider these motions next, but once again, the court will group them "thematically."

### A. Miller And Hall

The court will first consider a pair of motions attacking Donaldson's experts, James W. Miller and Jerry Lee Hall. The first motion in this pair is the reserved portion of EPC's November 21, 2003, motion (otherwise relating to obviousness-type double patenting) denominated as EPC's Motion To Strike Supplemental Expert Reports Of James W. Miller And Jerry Lee Hall (docket no. 241). Donaldson resisted that motion on December 4, 2003 (docket no. 243), and EPC filed a reply in further support of the motion on December 11, 2003 (docket no. 245). The second motion is EPC's January 9, 2004, Motion In Limine To Preclude The Testimony Of James W. Miller (docket no. 252). Donaldson resisted that motion on March 1, 2004 (docket no. 287), EPC filed a reply on March 8, 2004 (docket no. 300), and Donaldson was granted leave to file a surreply on March 22, 2004 (docket no. 309).

### 1. James W. Miller

#### a. Arguments of the parties

In the first of its attacks on the evidence from Donaldson's expert James W. Miller, EPC argues that Mr. Miller's August 5, 2003, Supplemental Report is not mere supplementation dealing with facts or circumstances that have arisen since the parties exchanged reports under the Scheduling Order, but is instead a report on entirely new subject matter: double patenting. EPC points out that Mr. Miller's original report, submitted in 2000, contained no reference to the issue of obviousness-type double patenting, so EPC did not depose Mr. Miller on that issue. EPC also points out that the Supplemental Report was not issued until nearly a year after the court ruled that Donaldson would be permitted to pursue its double-patenting defense. In both of its motions challenging Mr. Miller's testimony, EPC also argues that Mr. Miller is a patent attorney, not someone skilled in the relevant art, and as such, he is not qualified to testify with respect to the matters contained in his Supplemental Report. EPC argues that testimony from a lawyer is superfluous, because the court will instruct

the jury on the law. Moreover, EPC argues, Mr. Miller has been employed exclusively as an attorney, not as one skilled in the art, so that he is not qualified to offer the opinions in his Supplemental Report. In its second motion attacking Mr. Miller's testimony, EPC also argues that Mr. Miller should be precluded from testifying as a "legal expert" on anything other than PTO procedures. EPC argues that even that limited testimony may be redundant, in light of its proffer of a videotape from the Federal Judicial Center explaining PTO procedures. EPC opines that it would agree that its own "legal expert," Timothy Vezeau, would not testify if Mr. Miller's testimony is precluded.

Donaldson, on the other hand, argues that Mr. Miller's Supplemental Report was submitted after the court's September 2002 Order explicitly allowed Donaldson to assert its double-patenting defense and that the Supplemental Report properly deals with that defense. Donaldson contends that it would be unfair and illogical to allow the defense, then preclude Donaldson from submitting expert evidence related to it, on the basis that the deadline in the Scheduling Order for designation of experts had already passed. Donaldson contends that the Supplemental Report falls within the "harmless/substantial justification" test employed by the Eighth Circuit Court of Appeals for evidence submitted after a scheduling order deadline. Donaldson also argues that EPC is not prejudiced by the late report, because EPC admits that the contents of the report are essentially the same as Mr. Miller's February 5, 2002, affidavit in support of Donaldson's motion for summary judgment on double patenting. Donaldson also argues that the court has already rejected EPC's arguments by rejecting EPC's motion to strike Donaldson's reply in support of its summary judgment motion on double patenting. Donaldson also argues that, in 1999, Mr. Miller provided Donaldson with

a competent opinion that Donaldson's production of the NG Air Alert does not infringe the '456 patent. Therefore, Donaldson contends that his testimony is relevant and admissible concerning non-infringement and willful infringement. Donaldson contends that patent attorneys often testify in patent cases and that Mr. Miller's testimony would be helpful to the jury.

In its replies, EPC clarifies that it does, indeed, seek to exclude Mr. Miller's testimony on the issue of whether the NG Air Alert infringes the '456 patent. EPC also clarifies that it does *not* claim willful infringement of the '456 patent by the NG Air Alert; thus, EPC contends that Mr. Miller's testimony on willfulness as to the NG Air Alert is irrelevant. EPC also argues that Mr. Miller's intent to testify on infringement issues, not damages issues, distinguishes this case from a recent case in which this court declined to exclude expert testimony. EPC also reiterates that Mr. Miller's Supplemental Report is not proper supplementation, even if the court permitted Donaldson's belated assertion of the double-patenting defense, because Donaldson never sought relief from the Scheduling Order to permit supplementation of expert reports on new issues. EPC also reiterates its argument that Mr. Miller is not one skilled in the art, so that his testimony should be precluded.

In its surreply, Donaldson argues that, even if EPC is not seeking enhanced damages for willful infringement by the NG Air Alert, Mr. Miller's testimony is still admissible on Donaldson's equitable estoppel defense. Donaldson argues that Mr. Miller's testimony will show the care and effort that Donaldson took to redesign a non-infringing indicator once it was aware of EPC's intent to enforce the '456 patent.

#### b. *Analysis*

▮ *i. Late disclosure and improper supplementation.* In a case in-

volving alleged late filing of expert reports, the Eighth Circuit Court of Appeals explained,

> Federal Rule of Civil Procedure 16 permits the district court to set deadlines for the disclosure of evidence and to impose sanctions on a party for failing to meet a deadline. *See Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir.1998). Unless the failure to meet a deadline was either harmless or substantially justified, the court may sanction a party by excluding its evidence. *See id.* at 1008–09.

> FIRE asserts it was substantially justified in not filing the report because the City's initial disclosures were insufficient. However, FIRE did not raise this issue until four months after the disclosures were due and two months after the expert report deadline. Additionally, FIRE provided no explanation for its delay in raising this issue. Thus, even if we accepted this after-the-fact justification, it came far too late for us to say the district court abused its discretion by striking FIRE's expert.

*Firefighter's Inst. for Racial Equality ex. rel. Anderson v. City of St. Louis*, 220 F.3d 898, 902–03 (8th Cir.2000) (*FIRE*), *cert. denied*, 532 U.S. 921, 121 S.Ct. 1359, 149 L.Ed.2d 288 (2001). Similarly, in *Jochims v. Isuzu Motors, Ltd.*, 144 F.R.D. 350 (N.D.Iowa 1992), this court considered the following four factors to determine whether or not to permit the testimony of an untimely disclosed expert: the reason for failing to name the witness, the importance of the witness's testimony, the opposing party's need for time to prepare for the testimony, and whether a continuance would be useful. *Jochims*, 144 F.R.D. at 353–54 (citing *Patterson v. F.W. Woolworth Co.*, 786 F.2d 874, 879 (8th Cir. 1986)). This court then considered whether to impose sanctions for late disclosure, such as payment by the non-complying party of the opposing party's attorneys'

fees and expenses incurred because of the late disclosure, pursuant to Rule 16(f) of the Federal Rules of Civil Procedure, "draw[ing] a distinction between the factors set forth in *Patterson* which guide the court in its exercise of discretion to exclude late witnesses and [a party's] failure to promptly move for a modification of the scheduling order." *Id.* at 354. As to the latter question, the court considered whether the delay in moving to amend the scheduling order was substantially justified or whether other circumstances existed that make an order for expenses unjust. *Id.*

■ The court agrees with EPC that disclosure of Mr. Miller's report was untimely under the Scheduling Order, but finds that Donaldson was "substantially justified" in failing to name an expert to address the double-patenting defense until after this court's ruling in *EPC II* on September 30, 2002. *See FIRE*, 220 F.3d at 902–03. To put it another way, Donaldson had an adequate reason for failing to disclosure an expert on double patenting until after the ruling in *EPC II,* and after that ruling, the testimony of such an expert became very important. *See Jochims*, 144 F.R.D. at 353. Nevertheless, Donaldson should have requested leave to amend the Scheduling Order to disclose an expert on obviousness-type double patenting within a reasonable time after that issue was injected into the litigation by the ruling in *EPC II*, which allowed Donaldson to pursue that defense. Such a request for leave to designate an expert and/or to amend an existing expert's report to address double patenting would have been in the spirit of both the Scheduling Order and Rule 16 of the Federal Rules of Civil Procedure. Moreover, the court is not convinced that a supplemental expert's report dated August 5, 2003—more than ten months after the ruling allowing Donaldson to pursue the defense—was as expedi-

tious as might reasonably have been expected under the circumstances. *Cf. FIRE*, 220 F.3d at 902–03 (a court does not abuse its discretion by excluding an expert's report that comes "far too late"); *Jochims*, 144 F.R.D. at 353–54 (considering the opposing party's need to prepare in light of the belatedly disclosed evidence). Nevertheless, the court concludes that the belated disclosure was "harmless" for at least two reasons: (1) EPC concedes that Mr. Miller's report is consistent with his affidavit submitted in support of the summary judgment motion ruled on in *EPC II*, so that EPC cannot now argue that it was "surprised" by the contents of the report on the eve of trial; and (2) EPC has had Mr. Miller's report since August of 2003 and has, therefore, had plenty of time—extended by an intervening continuance of the trial date—to depose Mr. Miller or otherwise to prepare to respond to his report at trial, so that EPC, again, cannot claim surprise. *See id.* (failure to meet a disclosure deadline may be excused if the failure was "harmless"); *cf. Jochims*, 144 F.R.D. at 353–54 (considering, *inter alia*, the opposing party's need for time to prepare for the testimony and whether a continuance would be useful). For these same reasons, the court is not persuaded by EPC's argument that Mr. Miller's Supplemental Report and opinions therein are not proper "supplementation," but instead address entirely "new" issues, because EPC has had adequate opportunity to respond to the "new" issues. Therefore, neither Mr. Miller's Supplemental Report nor the opinions therein will be barred at trial on the basis of improper disclosure.[5]

 *ii. Patent attorneys as experts.* The next question, then, is whether Mr. Miller's expert opinions should be precluded at trial, because he is a patent attorney.

EPC is correct that the court bears the ultimate responsibility for instructing jurors on the law and that, in a non-patent case, the Eighth Circuit Court of Appeals observed that the district court properly ruled that a party's expert witness "could not testify regarding the requirements of the law." *See Farmland Indus. v. Frazier–Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir.1989). In that case, the court explained the rationale for such a rule to be that " '[t]he special knowledge of the judge makes the witness' testimony superfluous. * * * The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case.' " *Id.* (quoting *Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505, 510 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977)).

Contrary to EPC's contentions, however, the court can find no rule against a patent attorney testifying as an expert in a patent infringement case and opining on the "ultimate issues," such as infringement. Indeed, the Federal Circuit Court of Appeals has squarely addressed the question of whether an expert can testify as to the "ultimate issue" of patent infringement:

> Opticon argues that Barkan must have misunderstood this task [of applying a § 112, ¶ 6 claim to an accused structure], because he testified on the ultimate issue of infringement without discussing in detail equivalency between the structures of the accused devices and the structures disclosed in the patent specifications. *However, testimony on the ultimate issue of infringement is permissible in patent cases.* *Snellman v. Ricoh Co.*, 862 F.2d 283, 287, 8

---

5. Nor does the court find it necessary to impose any monetary sanctions on Donaldson for the belated disclosure, *see Jochims*, 144

F.R.D. at 354–56, and, indeed, EPC does not request any.

USPQ2d 1996, 2000 (Fed.Cir.1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3199, 105 L.Ed.2d 707 (1989) ("[a]lthough claim interpretation is a question of law, expert testimony is admissible ... to give an opinion on the ultimate question of infringement" (citations omitted)); Fed.R.Evid. 704. The scope of literally infringing "equivalents" under § 112 ¶ 6 is a factual determination. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 862, 226 USPQ 402, 408 (Fed.Cir. 1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). The responsibility for challenging the factual underpinnings of the testimony fell squarely on Opticon during cross-examination. *See Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir.1980), *cert. denied*, 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981) (" 'the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness [is] squarely on the shoulders of opposing counsel's cross-examination' " (citation omitted)); *see also Bryan v. FMC Corp., John Bean Div.*, 566 F.2d 541, 545 (5th Cir.1978) ("rule 705 shifts to the cross-examiner the burden of eliciting the bases of an expert witness' opinion"); *United States v. Santarpio*, 560 F.2d 448, 454–55 (1st Cir.1977), *cert. denied sub nom., Schepici v. United States*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977) (under Rule 705, court was entitled to credit expert's conclusion even though expert did not describe and explain the relevance of factors upon which his opinion rested; defendant neither cross-examined on basis for opinion nor attempted to show its inadequacy); *C. Van Der Lely, N.V. v. F. Ili Maschio S.n.c.*, 221 USPQ 34, 41, 1984 WL 179 (S.D.Ohio 1984), *aff'd*, 748 F.2d 1568 (Fed.Cir.1984) (under Rule 705, "[c]ross-examination [is] the proper procedure for the defendant to challenge the accuracy of [the expert's]

opinion"). Opticon failed to seize the opportunity, provided by the Rule, to demonstrate that Barkan's opinion testimony was factually incorrect.

Rule 705 functions to abbreviate trials by permitting opinion testimony without factual foundation. We see no reason why Rule 705 is not fully applicable to patent trials and opinion testimony on infringement of claims under § 112 ¶ 6. We have not directly addressed this issue, but have previously applied Rule 705 in a patent case on the issue of damages, stating that an expert need not "reveal the facts or data underlying his opinion ... because [the defendant] did not cross-examine on this issue and the master did not require otherwise." *Studiengesellschaft Kohle v. Dart Indus.*, 862 F.2d 1564, 1567, 9 USPQ2d 1273, 1277 (Fed.Cir.1988). Moreover, the Federal Rules of Evidence are expressly applicable to all proceedings in the courts of the United States, which must include civil suits arising under Title 35. Fed.R.Evid. 101. Finally, the specific purpose behind Rule 705 is to avoid "complex and time consuming" testimony by permitting an expert to " 'state his opinion and reasons without first specifying the data upon which it is based.' " Fed.R.Evid. 705 advisory committee's note quoting Rule 4515, N.Y. CPLR (McKinney 1963). Patent cases, so often typified by lengthy testimony on complex technical issues, are particularly served by this purpose.

*Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575–76 (Fed.Cir.1991) (emphasis added); *see also Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 287–88 (Fed.Cir. 1988) ("Although claim interpretation is a question of law, expert testimony is admissible to explain the meaning of technical terms in the claims and to give an opinion on the ultimate question of infringement.") (citations omitted). In light of these au-

thorities, it is not improper for Donaldson to offer a patent attorney as an expert, or for that expert to testify on "ultimate questions," such as infringement. Moreover, the court concludes that EPC's argument that Mr. Miller is not "a person skilled in the art" really goes to the weight, not the admissibility, of Mr. Miller's testimony. Rule 705 permits EPC to challenge during cross-examination the basis for Mr. Miller's opinions regarding infringement or any other "ultimate issue" in this litigation.

Therefore, the court will deny EPC's motions to exclude the reports or testimony of Donaldson's expert James W. Miller.

### 2. Jerry Lee Hall

EPC's sole ground for seeking to exclude the Supplemental Report of Donaldson's expert Jerry Lee Hall appears to be the untimeliness of that report. For essentially the same reasons stated above for rejecting the same arguments concerning Mr. Miller's Supplemental Report, the court will deny the portion of EPC's motion seeking to strike the Supplemental Report by Jerry Lee Hall.

### B. Expert On Lost Profits

The next motion relating to "experts" is Donaldson's January 9, 2004, Motion In Limine To Exclude Unreliable Expert Opinion On Lost Profits Under Rule 702 Of The Federal Rules Of Evidence (docket no. 263). EPC resisted this motion on January 16, 2004 (docket no. 270), then filed a corrected and amended resistance on March 1, 2004 (docket no. 284). Donaldson filed its reply in further support of the motion on March 2, 2004 (docket no. 294), then filed a reply to EPC's amended and corrected resistance on March 24, 2004 (docket no. 313). EPC then filed a surreply, in which EPC embedded a Motion To Strike Affidavit Of James F. Nieberding And To Preclude Testimony Of Any New Economic Expert (docket no.

326). EPC's motion regarding Dr. Nieberding will be addressed in Subsection C in conjunction with Donaldson's motion to strike the March 1, 2004, report by EPC's expert on "lost profits."

### 1. Arguments of the parties

In this motion, Donaldson mounts a "Daubert challenge" pursuant to Rule 702 of the Federal Rules of Evidence to the "lost profits" opinions of EPC's expert, Bruce W. Burton. Donaldson contends that these opinions are "unreliable," because they lack any sound economic proof, where Mr. Burton did not account for the law of demand in his lost profits calculation. Donaldson also points out the ever-changing analysis provided by Mr. Burton through five expert reports as demonstrating the unreliability of his opinions. Donaldson also argues that Mr. Burton is "not qualified" to opine on EPC's lost profits, because he is an accountant, not an economist, and therefore, is not qualified to provide the necessary econometric analysis. Consequently Donaldson argues that Mr. Burton's "lost profits" testimony should be excluded under Rule 702.

In its corrected and amended resistance to Donaldson's motion, EPC takes umbrage at the notion that Mr. Burton is a mere accountant. Instead, EPC points out that Mr. Burton is the National Head of the Deloitte & Touche Intellectual Asset Management practice and Regional Head of the Intellectual Property Dispute Consulting practice, has an MBA in finance and an undergraduate degree in Business, and has over twenty years of experience in calculating lost profit damages. As to the reliability of Mr. Burton's opinions, EPC contends that Mr. Burton has performed the appropriate, focused analysis of lost profits and price erosion in a narrow market with a finite customer set. Thus, EPC contends, Mr. Burton was able to conduct

a customer-by-customer market analysis, rather than a broad, generalized assessment, thereby properly considering the law of demand in a unique market. Consequently, EPC contends that it will be able to establish more than adequate factual and methodological basis for Mr. Burton's opinions.

In its reply to EPC's corrected and amended resistance, Donaldson reiterates its challenges to the reliability of Mr. Burton's lost profits and price erosion opinions and his qualifications to state such opinions. Donaldson also states that it has recently had an economist, Dr. James F. Nieberding, review Mr. Burton's methodology and that Dr. Nieberding has noted a number of flaws in Mr. Burton's analysis. In its surreply *cum* motion to exclude, EPC seeks to exclude any evidence from Dr. Nieberding, or any other "new" economic expert, on the basis of extraordinarily late disclosure, four years after the deadline for such disclosures in the Scheduling Order.

Again, the court will address in Subsection C the dispute over injection of Dr. Nieberding's opinions into this case, as well as Donaldson's motion to exclude Mr. Burton's March 1, 2004, report. The focus of the present motion is Mr. Burton's qualification to state certain opinions and the reliability of those opinions under Rule 702 of the Federal Rules of Evidence and *Daubert.*

### 2. The "Daubert standard"

This court recently addressed the *"Daubert* standard" for admissibility of expert testimony in *Pioneer Hi–Bred International, Inc. v. Ottawa Plant Food, Inc.,* 219 F.R.D. 135 (N.D.Iowa 2003). This court explained,

> In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court interpreted the require-

ments of Rule 702 of the Federal Rules of Evidence concerning testimony by experts. As the Eighth Circuit Court of Appeals subsequently explained, as interpreted by *Daubert,*

> Rule 702 requires the trial judge to act as a "gatekeeper," admitting expert testimony only if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial court is granted broad discretion in its determination of reliability. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The gatekeeper role should not, however, invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence, *see Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.,* 125 F.3d 1176, 1183 (8th Cir. 1997). Expert testimony should be admitted if [1] it is based on sufficient facts, [2] it "is the product of reliable principles and methods," and [3] "the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702; *see also General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

*United States v. Vesey,* 338 F.3d 913, 916–17 (8th Cir.2003); *Anderson v. Raymond Corp.,* 340 F.3d 520, 523 (8th Cir. 2003) ("Under [*Daubert* ], district courts must act as gatekeepers to 'insure that proffered expert testimony is both relevant and reliable.' ") (quoting *Dancy v. Hyster Co.,* 127 F.3d 649, 652 (8th Cir. 1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 316 (1998)); *Kudabeck v. Kroger Co.,* 338 F.3d 856, 859 (8th Cir.2003) ("[Rule 702] consists of three distinct but related requirements: (1) the evidence must be based on scien-

tific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy.").

In *Daubert*, the Supreme Court established how the trial court is to perform its "gatekeeper" function under Rule 702:

> First, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." [*Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469]. The Court cautioned that the trial court must focus "on [the] principles and methodology, not on the conclusions that they generate." *Id.* at 595, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Second, the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact. *Id.* at 592, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Id.* at 591, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. The Court, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), clarified that the district court's gatekeeper function applies to all expert testimony, not just testimony based in science. *Id.* at 147, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238.

*Kudabeck*, 338 F.3d at 860. However, "[a]s the Supreme Court emphasized in *Daubert*, 509 U.S. at 595–96, 113 S.Ct. 2786, 125 L.Ed.2d 469, 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Vesey*, 338 F.3d at 917.

*Daubert* rulings are reviewed for abuse of discretion. *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 758 (8th Cir.2003). As the Eighth Circuit Court of Appeals recently explained,

> Although in limine hearings are generally recommended prior to *Daubert* determinations, *see Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir.1999), they are not required, *see Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 685–86 (8th Cir.2001). The only legal requirement is that the parties "have an adequate opportunity to be heard" before the district court makes its decision. *See, e.g., Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 249 & n. 3 (6th Cir.2001), *cert. denied*, 534 U.S. 822, 122 S.Ct. 56, 151 L.Ed.2d 25 (2001); *Cortes–Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 n. 3 (1st Cir.1997).

*Group Health Plan, Inc.*, 344 F.3d at 761 n. 3; *accord Anderson*, 340 F.3d at 524 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). For example, the opportunity to present written arguments and supporting submissions may constitute an "adequate opportunity to be heard" on a *Daubert* question. *Id. Pioneer Hi–Bred Int'l, Inc.*, 219 F.R.D. at 138–39.

In this case, the short time between Donaldson's *Daubert* motion and trial and the court's crowded schedule have not permitted an "in limine hearing" prior to *Daubert* determinations. *See Group Health Plan, Inc.*, 344 F.3d at 761 n. 3. Indeed,

neither of the parties requested such a hearing, despite the clearly contentious nature of the motion, as demonstrated by the briefing. Therefore, the court will resolve what *Daubert* issues it can from the parties' written arguments and supporting submissions, and reserve any remaining issues for trial.

### 3. Application of the "Daubert standard"

■ In the present case, the court's "preliminary assessment," from its review of the copious submissions in support of and resistance to Donaldson's motion, is that the reasoning and methodology underlying Mr. Burton's testimony are scientifically valid and that Mr. Burton's reasoning and methodology can be applied to the facts in issue. *See Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786 (first step in the court's "gatekeeper" function under Rule 702); *Kudabeck*, 338 F.3d at 860 (same). Although Donaldson is clearly unhappy with Mr. Burton's conclusions, and has cloaked that unhappiness in challenges to "reasoning and methodology," the court finds that EPC has adequately supported Mr. Burton's reasoning and methodology to warrant submission of his opinions to a jury. This is true, despite the somewhat "fluid" nature of Mr. Burton's opinions, which have evolved through a series of expert reports, involving both adjustments in facts and methodology. Ultimately, the court believes that to exclude Mr. Burton's testimony and reports in this case would "invade the province of the jury, whose job it is to decide issues of credibility and to determine the weight that should be accorded evidence." *Vesey*, 338 F.3d at 916–17.

The court is also convinced that the proposed expert testimony is relevant and will serve to aid the trier of fact. *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786 (second step in the analysis); *Kudabeck*, 338 F.3d at 860 (same). Plainly, Mr. Burton's testi-mony will provide information beyond the common knowledge of the trier of fact regarding the workings of the purportedly narrow market for air filter restriction indicator devices. *See id.* at 591, 113 S.Ct. 2786 (explaining that expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact).

This then, is a case in which vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are not only traditional, but appropriate means of attacking what Donaldson contends is shaky evidence. *Daubert*, 509 U.S. at 595–96, 113 S.Ct. 2786; *Vesey*, 338 F.3d at 917. Donaldson's motion to exclude EPC's expert evidence on lost profits will be denied.

### C. Untimely Expert Reports

The final motions relating to experts now before the court are Donaldson's March 26, 2004, Motion In Limine To Exclude Bruce Burton's March 1, 2004, Expert Report And Other Untimely Expert Disclosures (docket no. 320) and EPC's March 31, 2004, Motion To Strike Affidavit Of James F. Nieberding And To Preclude Testimony Of Any New Economic Expert, which is embedded in EPC's surreply to Donaldson's motion to exclude Mr. Burton's testimony on lost profits (docket no. 326). EPC resisted Donaldson's motion on April 2, 2004 (docket no. 330), and Donaldson filed both a reply in further support of its own motion and a resistance to EPC's motion on April 7, 2004 (docket nos. 338 and 339, respectively). The parties' arguments on these two motions address whether the court should exclude either Mr. Burton's March 1, 2004, report and summary exhibits based upon that report, or Dr. Nieberding's response to that report, or both.

### 1. Arguments of the parties

Donaldson, the first movant, argues that Mr. Burton's March 1, 2004, report comes years after the applicable disclosure deadline in the Scheduling Order and discloses expert opinions not previously disclosed, for example, concerning market inelasticity for model years 1997 through 2002. Donaldson contends that EPC cannot justify the untimely disclosure of the latest expert report, because EPC has known the underlying facts for years, and is simply scrambling to come up with an analysis that overcomes some of the flaws pointed out in Donaldson's motion to exclude Mr. Burton's opinions on lost profits. Donaldson also argues that the new report is extremely prejudicial to Donaldson, because it has forced Donaldson to attempt, on the eve of trial, to find an available, qualified economics expert to rebut Mr. Burton's new analysis; EPC failed to make Mr. Burton available for deposition, as previously agreed, until March 9, 2004; Donaldson must now engage in significant additional discovery as a distraction from trial preparation; and admission of the report will allow the jury to hear an expert opinion predicated on false assumptions. Donaldson argues that Mr. Burton's untimely report cannot be justified by a supposed need to respond to Donaldson's own motion to exclude Mr. Burton's opinions, because such a late report rises to the level of bad faith and actually demonstrates the unreliability of Mr. Burton's opinions. Donaldson also argues that the summary exhibits supporting Mr. Burton's latest report should be excluded, because they were not properly disclosed by the deadline for expert disclosures and embody new information and new analyses. Donaldson argues that the district-by-district "opt out" provisions for disclosure of summary exhibits in the present version of Rule 26(a)(2)(B) ended in January 2001, and that EPC consequently failed to disclose the summary exhibits with expert reports in 2001, 2003, or 2004 as required.

On the other hand, Donaldson argues that it was substantially justified in injecting the opinions of Donaldson's own "new" economics expert, Dr. Nieberding, into this litigation at the eleventh hour, because of the need to respond to EPC's resistance to Donaldson's motion to exclude Mr. Burton's opinions on lost profits. Donaldson argues that EPC has been unable to point to any portion of the record supporting EPC's contentions that Mr. Burton's latest report is not a departure from his prior opinions, so that Dr. Nieberding's opinions are essential to Donaldson's attempts to counter Mr. Burton's opinions. Donaldson also argues that the belated disclosure of Mr. Burton's latest report provides sufficient explanation for Donaldson's own recent disclosure of Dr. Nieberding's opinions. Moreover, Donaldson contends that exclusion of Dr. Nieberding's opinions, but not Mr. Burton's, would severely prejudice Donaldson's ability to rebut Mr. Burton's flawed analysis. Therefore, Donaldson argues that the Scheduling Order and exceptions to it should be uniformly applied in this case, so that Dr. Nieberding's opinions should be admissible if Mr. Burton's belated report is admissible. Finally, Donaldson argues that a continuance of the trial is not appropriate, at this late date, to address what amounts to no more than a post hoc justification for Mr. Burton's flawed opinions.

EPC argues that Mr. Burton's March 1, 2004, report is a proper supplement, which accounts for a change in the facts—based on actual versus forecasted sales, etc.—and adjusts damages—actually withdrawing price erosion claims for 2003, because consumer choice first became a factor in that year—in a way that Mr. Burton addressed in depositions. EPC also argues that the latest report

responds to Donaldson's erroneous factual arguments about sales volume and elasticity of demand, and properly anticipates Donaldson's cross-examination and argument. EPC also argues that Donaldson is not prejudiced by the latest report, and that no continuance is necessary to address it, because the elimination of price erosion damages for model year 2003 actually results in a reduction in EPC's damages claim. EPC also argues that Donaldson is not prejudiced just because EPC has now anticipated Donaldson's counterarguments. Moreover, EPC argues that there is no prejudice to Donaldson, because the new report makes no significant change in the basic analysis of "but for" prices and non-elasticity of the market, even where the terms in which that analysis is couched may have evolved. Finally, EPC argues that Donaldson was not prejudiced by a need to find an economics expert, because the opinions of any such expert are irrelevant to the limited market in question here. EPC also argues that there is no basis for excluding the summary exhibits, because, at the time that the Scheduling Order was entered, this district had opted out of the provisions of Rule 26 of the Federal Rules of Civil Procedure, which would have required earlier disclosure. Any remaining objections to the summaries, EPC argues, are foundational, and so must await trial to be resolved.

As to Dr. Nieberding, EPC argues that the court should not tolerate disclosure of an entirely new expert, with an entirely new analysis, on the eve of trial. EPC argues that disclosure of a new expert was not reasonably justified by anything supposedly "new" in Mr. Burton's latest opinions. EPC contends that Dr. Nieberding's opinions are, in any event, of small importance, because his objections to Mr. Burton's analysis are groundless. On the other hand, EPC argues that it will be seriously prejudiced if Dr. Nieberding's opinions are injected into this litigation at this late date, because there is now insufficient time for EPC to depose Donaldson's new expert or to find and prepare a new expert of its own to counter Dr. Nieberding's opinions.

### 2. Analysis

#### a. Applicable standards

As the court explained above, in its analysis of EPC's motion to exclude expert testimony from Mr. Miller, the Eighth Circuit Court of Appeals has applied a "harmless or substantially justified" standard to untimely disclosures of evidence, see FIRE, 220 F.3d at 902–03, while this court has used a similar, but more expansive, four-factor test to determine whether or not to permit the testimony of a untimely disclosed expert, which involves consideration of the reason for failing to name the witness, the importance of the witness's testimony, the opposing party's need for time to prepare for the testimony, and whether a continuance would be useful. Jochims, 144 F.R.D. at 353–54 (citing Patterson, 786 F.2d at 879). These standards are again applicable here, at least as to Donaldson's belated disclosure of Dr. Nieberding's opinions, where he is an entirely "new" expert.

On the other hand, the court finds that Rule 26(a)(2) is the authority principally applicable to disclosure of Mr. Burton's March 1, 2004, report and the summary exhibits now at issue. The court agrees with the parties that, prior to 2001, the courts of this district had "opted out" of some of the provisions of Rule 26, as amended in 1993, but that "opt out" ended after the 2000 amendments came into force. Thus, for the last three years or so, the provisions of Rule 26(a)(2) applicable here stated the following:

(B) Except as otherwise stipulated or directed by the court, this disclosure [of

expert testimony, as provided in (a)(2)(A)] shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; *any exhibits to be used as a summary of or support for the opinions;* the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

(C) These disclosures shall be made at the times and in the sequence directed by the court. *In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party. The parties shall supplement these disclosures when required under subdivision (e)(1).*

FED. R. CIV. P. 26(a)(2)(B) & (C) (2000) (emphasis added). The duty of supplementation identified in Rule 26(a)(2)(C) is as follows:

(e) Supplementation of Disclosures and Responses. A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure

or response to include information thereafter acquired if ordered by the court or in the following circumstances:

(1) *A party is under a duty to supplement* at appropriate intervals its disclosures under subdivision (a) *if the party learns that in some material respect the information disclosed is incomplete or incorrect* and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. *With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due.*

FED. R. CIV. P. 26(e)(1) (2000) (emphasis added). Rule 26(a)(3) provides that "pretrial disclosures," in addition to other initial disclosures and disclosures of experts, be made "at least 30 days before trial," unless otherwise directed by the court. FED. R. CIV. P. 26(a)(3).

### b. *Exclusion of Mr. Burton's March 1, 2004, report and summary exhibits*

 Although the parties have argued the question of whether or not Mr. Burton's March 1, 2004, report and summary exhibits should be excluded under the standards stated in *FIRE* and *Jochims,* the court will begin its analysis with the standards of Rule 26. Donaldson does not complain that *Mr. Burton* was untimely disclosed within the meaning of Rule 26(a)(2)(B). Thus, the dispute is really whether or not the "supplementation" of Mr. Burton's report on March 1, 2004, was permissible under Rule 26(e)(1). *See* FED.

R. Civ. P. 26(a)(2)(C) (providing for supplementation of an expert disclosure pursuant to Rule 26(e)(1)). Although the court is not entirely convinced that all of the different information and analysis in Mr. Burton's March 1, 2004, report is "supplementation" on the basis of EPC discovering that Mr. Burton's report was based on information that was "incomplete or incorrect," *see* FED. R. CIV. P. 26(e)(1), EPC's argument that this is the case is at least colorable. Rule 26(e)(1), in turn, requires that any supplementation to an expert's report "shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due." *Id.* Rule 26(a)(3) disclosures, again, are due at least 30 days before trial, unless the court directs otherwise. FED. R. CIV. P. 26(a)(3). The court has examined the last two trial management orders, the one dated August 15, 2003, and the one dated January 23, 2004 (docket no. 273), and finds no specific deadline for disclosure of final expert reports, although both orders require that witness lists be *exchanged* but not *filed* twenty-one days before the final pretrial conference. Thus, a final supplementation to an expert report was due in this case pursuant to Rule 26(e)(1) and (a)(3), at the earliest, twenty-one days before the April 9, 2004, final pretrial conference, or March 19, 2004.[6] Therefore, a final "supplementation" of Mr. Burton's report on March 1, 2004, was timely.

To the extent that the March 1, 2004, report was more than a "supplementation," the court believes that it would be subject to the *FIRE* and *Jochims* standards. In that regard, the court is not entirely convinced that the filing of Donaldson's January 9, 2004, Rule 702 challenge to Mr. Burton's opinions, standing alone, "sub-

stantially justified" or provided adequate reason for another expert report. *See FIRE*, 220 F.3d at 902–03; *Jochims*, 144 F.R.D. at 353. On the other hand, it would be ridiculous to hold that a challenged expert should have no opportunity to address any actual errors or omissions pointed out by an opposing party in a Rule 702 challenge, particularly when the opposing party will have the opportunity at trial to point out "changes" in an expert's opinion in an attempt to undercut that expert's opinion as a "moving target" that changes on a whim. It is necessarily "important" for a party's expert to address challenges to the expert's methodology, data, or conclusions. *See Jochims*, 144 F.R.D. at 353 (second factor). Moreover, notwithstanding Donaldson's arguments about *potential* harm from an eleventh hour revision to an expert's report, it is clear in this case that Donaldson has found and used an expert to challenge the revised report, and the parties have rehearsed their jury arguments regarding the precise issues raised by the revised report. *See FIRE*, 220 F.3d at 902–03 (failure to meet a disclosure deadline may be excused if the failure was "harmless"); *cf. Jochims*, 144 F.R.D. at 353–54 (considering, *inter alia*, the opposing party's need for time to prepare for the testimony and whether a continuance would be useful). Ultimately, the court concludes that the parties' arguments for and against admissibility of the March 1, 2004, report present *jury questions* concerning the *weight* to be given that report. Therefore, the court will not exclude Mr. Burton's March 1, 2004, report.

The court likewise finds that the disclosure of EPC's summary exhibits in support of Mr. Burton's opinions are suf-

---

**6.** By order dated March 31, 2004, the final pretrial conference was reset to April 12, 2004 (and has since been reset again), but that has no impact, under the circumstances, on the deadline for pretrial disclosures, because the order resetting the final pretrial conference was less than twenty-one days before the pretrial conference, so that final disclosures should already have been made.

ficiently early to be deemed timely, essentially for the same reasons that the report to which they apply is timely. See FED. R. CIV. P. 26(a)(2)(B) (requiring disclosure of "exhibits to be used as a summary of or support for the [expert's] opinions" when the report is disclosed). Donaldson will have the opportunity at trial to challenge the foundation, contents, and accuracy of those summaries, so that the court is hard-pressed to see the "harm" or "prejudice" to Donaldson in those exhibits from a pretrial vantage point. Therefore, this portion of Donaldson's motion will also be denied.

### c. *Exclusion of Dr. Nieberding's evidence*

██ Along with its surreply to Donaldson's motion to exclude Mr. Burton's latest report and other new exhibits, EPC moved to exclude any evidence from Dr. Nieberding, or any other "new" economic expert, on the basis of extraordinarily late disclosure. Donaldson resisted that motion. Under the standards relating to untimely disclosure of experts identified above, whether or not the eleventh-hour injection of Dr. Nieberding's opinions into this litigation is proper is, perhaps, a close question. However, the court concludes that Dr. Nieberding's evidence will not be excluded. To the extent that Mr. Burton's latest report actually presents a new analysis, Donaldson was substantially justified in late disclosure of a qualified expert to challenge that analysis, and such an expert's evidence is important to Donaldson's challenge to EPC's damages claim. See FIRE, 220 F.3d at 902–03; Jochims, 144 F.R.D. at 353. This is true, even though Donaldson has been aware of the prior permutations of Mr. Burton's lost profits and price erosion analysis for several years, because there is some merit to Donaldson's contention that Mr. Burton has belatedly changed the premises of that analysis. This is also true, even though

Donaldson did not produce its new expert until its reply brief, which would ordinarily have left EPC with no opportunity to respond to it, because the court afforded EPC the opportunity to file a surreply, in part to address the unforeseen opinions of a previously unknown expert. The court is not persuaded by EPC's "prejudice" or "harm" argument, see id. (also considering "harm" to the opposing party), claiming that EPC must now find a new expert of its own to address Dr. Nieberding's opinions, where EPC has argued strenuously that Mr. Burton's opinions withstand Dr. Nieberding's criticisms. Again, the parties have now had an opportunity to rehearse their presentations concerning the validity of Mr. Burton's and Dr. Nieberding's positions, so that there is little need for additional time for each party to address the other's contentions, and no need for a continuance of the trial based upon the late disclosure of Dr. Nieberding. See Jochims, 144 F.R.D. at 353–54 (third and fourth factors). Therefore, EPC's motion to exclude evidence from Dr. Nieberding will also be denied.

## V. WAIVER OF PRIVILEGE

### A. *The Pending Motions*

Another hotly contested issue in this case concerns the alleged waiver of attorney-client privilege as to communications between EPC and its former patent counsel, John Held, including whether any waiver occurred, and if so, the extent of that waiver. Once again, several motions address this issue. The first is Donaldson's January 9, 2004, Motion In Limine On Admissibility of Evidence Pertaining To Plaintiff's Waived Communications With Patent Counsel (docket no. 260), a "corrected" version of which was filed the same day (docket no. 249). EPC resisted the corrected motion on January 16, 2004 (docket no. 268). On January 9, 2004,

EPC filed its own Motion In Limine To Limit Scope Of Attorney Client Privilege Evidence (docket no. 250). Donaldson resisted EPC's motion on March 1, 2004 (docket no. 290), and the same day filed a Motion In Limine To Exclude Any Testimony Prevented By EPC's Now Abandoned Privilege Objections (docket no. 289), accompanied by a joint brief in resistance to EPC's motion and in support of its own motion. EPC resisted Donaldson's March 1, 2004, motion on March 24, 2004 (docket no. 312), and Donaldson filed a reply on March 31, 2004 (docket no. 325). The final motion concerning attorney-client privilege, filed by Donaldson on March 26, 2004, is Donaldson's Motion In Limine On Admissibility Of January 20, 1998, Letter From John Held (docket no. 319). EPC responded to that motion on April 2, 2004 (docket no. 332).

### B. Background

The present dispute involves communications by and between John Held, EPC's former patent attorney, and EPC in three distinct time frames: circa 1984, circa 1996, and on January 20, 1998. In 1984, Mr. Held provided EPC with a report on the status of EPC's various patents and exploring the possibility of various legal actions against Donaldson and the defenses that Donaldson might raise. During his deposition, Mr. Held was at first instructed not to answer questions about that report or other communications that he had with EPC during the 1984 time frame. However, after discussions between counsel, Mr. Held was permitted to testify regarding communications that he had with EPC on the topics of sleeping on rights, laches, and estoppel in the 1980s, but subject to a reservation of EPC's rights to challenge admissibility of that testimony at trial. Donaldson contends that it was denied a full and fair opportunity to question Mr. Held about his communications with EPC in 1984. EPC denies that contention.

On September 4, 1996, EPC's President, Peter Simer, wrote a memorandum to EPC's former President, Ike Leighty, in which Simer noted that John Held had estimated that a patent protection lawsuit against Donaldson would be very costly, from $100,000 up to $500,000. *See* Docket no. 261, Exhibit A, at 3. In the course of discovery in this litigation, EPC produced a September 23, 1996, letter from Simer to Held, concerning possible actions against Donaldson, in which Simer opined that EPC believed that Donaldson was likely to try to market its new "gauge" to EPC's customers, and that EPC "believe[d] it is most likely, since we have 'sat on our rights' this long, that Donaldson probably merely evolved the Informer, rather than develop a completely new gauge." Declaration of Christopher J. Sorenson (docket no. 260), Exhibit B. On the first day of Mr. Simer's deposition, when he was asked about the source of his belief that EPC had "sat on its rights," EPC contends that Simer "inadvertently disclosed" that the opinion came from EPC's patent counsel. Donaldson was then allowed to question Simer extensively about his September 4, 1996, memorandum and his communications with Mr. Held in 1996. On the second day of Simer's deposition, EPC initially objected to questions about the persons with whom Simer had discussed the legal doctrine of estoppel and the fact that EPC had slept on its rights. After various exchanges between counsel, Donaldson was ultimately allowed to question Simer about communications with Mr. Held in 1996 regarding laches and estoppel defenses, in order to avoid a discovery dispute or the need to reconvene the deposition, but EPC asserted privilege as to communications on those topics with EPC's present counsel, who were engaged in 1998.

EPC also produced hundreds of pages of documents from Mr. Held's files relating to the patents at issue in this litigation,

**1018**

from both the 1984 and the 1996 time frames, but EPC asserted that it was reserving claims of attorney-client privilege as to those documents. Among the documents produced was Mr. Held's October 30, 1996, report to EPC "concerning the legal claims that [EPC] might have against Donaldson." Declaration of Christopher J. Sorenson (docket no. 260), Exhibit H. When Mr. Held was deposed, the parties again had a dispute about whether or not he could answer questions regarding the 1996 communications. EPC contends that Mr. Held was allowed to answer all questions concerning his communications with EPC in 1996 subject to a reservation of EPC's right to challenge the admissibility of Mr. Held's testimony on those subjects at trial. Donaldson claims that it was denied a full and fair opportunity to question Mr. Held about the 1996 communications. EPC again denies that contention.

On January 20, 1998, Mr. Held wrote a letter to EPC's Chairman, Ike Leighty, which discussed the expiration dates for four patents owned by EPC, including the '456 patent; the effect of EPC's redesign of its product; and EPC's obligations under the assignment agreement between Mr. Nelson, the inventor of the '456 patent, and EPC. On January 22, 1998, EPC forwarded the letter to Fran Nelson, the inventor's widow. Donaldson now seeks a ruling on the admissibility of this letter. In its response to that motion, EPC states that it does not dispute that this letter is not protected by the attorney-client privilege.

The parties agree that the present dispute over waiver of attorney-client privilege is not only a reanimation of disputes during the depositions of Simer and Held, but a reanimation of a dispute on the same issue during litigation of summary judgment motions before Judge Melloy in 2000. In an order dated September 19, 2001 (docket no. 129), Judge Melloy concluded,

The challenged information was neither addressed nor relied upon by the Court in resolving the parties' summary judgment motions. While the issue of admissibility of the evidence may still be relevant for trial purposes, the Court is of the opinion that the matter can be more expediently resolved at a date closer to trial should Defendant still wish to introduce the challenged evidence.

Accordingly, Defendant's motion on admissibility of certain evidence (Doc. no. 95) is DENIED WITHOUT PREJUDICE.

Order of September 19, 2001, at 2. The parties followed Judge Melloy's ruling, reanimating this dispute before trial, in light of Donaldson's continued desire to admit documents and testimony purportedly protected by attorney-client privilege.

### C. Analysis

#### 1. Arguments of the parties

In the corrected version of its first motion regarding waiver of attorney-client privilege, Donaldson asserts that EPC has waived the attorney-client privilege as to its communications between EPC and Mr. Held in 1996 and any testimony about those communications. Therefore, Donaldson asks the court to rule that the attorney-client privilege has been waived as to the pertinent evidence and that such evidence is otherwise admissible at trial. In its resistance and in its own motion to limit the scope of attorney-client privilege evidence, EPC does not concede that there was any waiver, but nevertheless proposes an "accommodation" that EPC asserts is consistent with applicable law. That accommodation is that EPC will withdraw its prior resistance to Donaldson's motion as long as the scope of admissibility is limited to communications between EPC and its prior attorney, John Held, on the subject of laches and estoppel.

Unfortunately, EPC's proffered accommodation did not end the controversy. Instead, in its resistance to EPC's "accommodation" motion and in support of its own motion to exclude evidence on which EPC has now abandoned its assertions of attorney-client privilege, Donaldson argues that EPC has waived the privilege as to *all* correspondence between EPC and John Held in 1996, by voluntary disclosure and by placing the information at issue in the case, and as to *all* documents produced that Donaldson was *not* prohibited from exploring with Mr. Held at his deposition on January 21, 2000. Thus, Donaldson asserts that the court should grant its original motion and deny EPC's "accommodation" motion. Donaldson also argues that EPC's offer to waive the privilege as to *all* communications between EPC and Mr. Held on the subject of laches and estoppel reflects a change in EPC's position. Donaldson argues that it is prejudiced by this change in position, because it occurs well after the close of discovery, and because Mr. Held was repeatedly instructed during his deposition not to answer questions about other communications within the scope of the present offer of a waiver. Donaldson contends that, at the same time that EPC is trying to use the attorney-client privilege as a shield, it is also trying to use it as a sword, by waiving the privilege on the eve of trial as to documents and testimony that will support its position, while blocking Donaldson's discovery as to those same items. Consequently, Donaldson asserts that EPC should be barred from using any testimony of Mr. Held at trial pertaining to issues on which Donaldson was prevented from examining Mr. Held at his deposition. Donaldson contends that it now has no practical means of reconvening the deposition of Mr. Held.

In its resistance to these arguments, EPC argues that Donaldson relies on truncated excerpts from the deposition of Mr.

Held in support of its contention that it was not allowed to examine him on all evidence as to which EPC is now willing to waive the privilege. From review of larger excerpts, EPC argues that it is obvious that Donaldson had a full and fair opportunity to explore the pertinent issues with Mr. Held as to both the 1984 and the 1996 communications. Thus, EPC contends that, as to communications from both time frames, Donaldson obtained the discovery that it contends is missing, subject only to reservation of EPC's right to challenge admissibility at trial and a promise that Donaldson would not use the deposition as the basis to argue a broader waiver. EPC argues that it took this course to avoid a protracted and costly discovery dispute or the need to reconvene Mr. Held's deposition, not to make a broader waiver of attorney-client privilege.

In its reply, Donaldson argues that EPC is trying to blur the narrow issue at hand, which Donaldson argues is that, just before trial, EPC has changed its position on privilege objections to Donaldson's prejudice, because Donaldson was previously allowed only very limited discovery on the communications at issue and had no reason to believe that EPC would later change its position. Donaldson reiterates that EPC is trying to use the privilege as both a shield and a sword, because it seeks to obtain the benefit of both objecting to Mr. Held's testimony at his deposition, and at other points in the litigation, on the basis of privilege, but then seeking to use Mr. Held's 1984 and 1996 communications with EPC to EPC's advantage by withdrawing the privilege objections on the eve of trial. Donaldson contends that EPC should now be barred from offering "new" evidence at trial, *i.e.,* evidence that formerly fell within its assertions of privilege as to which Donaldson was not allowed discovery.

As mentioned above, the parties agree that no attorney-client privilege now attaches to Mr. Held's January 20, 1998, letter.

### 2. Applicable law

 The Eighth Circuit Court of Appeals has explained waiver and protection of attorney-client privilege generally, as follows:

> The attorney/client privilege is waived by the voluntary disclosure of privileged communications, and courts typically apply such a waiver to all communications on the same subject matter. *See United States v. Workman,* 138 F.3d 1261, 1263 (8th Cir.1998). Thus, a party wishing to invoke the privilege in responding to document discovery must assert it as to all [*992] documents to which it may apply.

*PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership,* 187 F.3d 988, 991–92 (8th Cir.1999), *cert. denied,* 529 U.S. 1020, 120 S.Ct. 1421, 146 L.Ed.2d 313 (2000); *United States v. Workman,* 138 F.3d 1261, 1263 (8th Cir.1998) ("Voluntary disclosure of attorney client communications expressly waives the privilege [and][t]he waiver covers any information directly related to that which was actually disclosed."). In addition to such "express" waiver, "[t]he attorney client privilege may also be implicitly waived, and one way that is done is by raising attorney advice as a defense." *Workman,* 138 F.3d at 1263 (internal citations omitted). Therefore, a party "cannot selectively assert privilege to block the introduction of information harmful to his case after introducing other aspects of his conversation with [counsel] to his own benefit." *Id.* In other words, "[t]he attorney client privilege cannot be used as both a shield and a sword," and a party, therefore, cannot claim advice of counsel as a defense without permitting the opposing party to explore the substance of that advice. *Id.* While waiver applies to "all communications on the same subject matter," *see PaineWebber Group, Inc.,* 187 F.3d at 991, the waiver does not apply to other documents or subjects that are insufficiently linked to documents or subjects on which a waiver occurred. *See John Morrell & Co. v. Local Union 304A of the United Food and Commercial Workers, AFL–CIO,* 913 F.2d 544, 556 (8th Cir. 1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991).

 It is not clear what rule applies to an "inadvertent" disclosure of otherwise privileged attorney-client communications in this federal question case, where the Eighth Circuit Court of Appeals has yet to define how inadvertent disclosure affects attorney-client privilege in such cases. *See Gray v. Bicknell,* 86 F.3d 1472, 1483 (8th Cir.1996) (state law applied to the existence and scope of attorney-client privilege in the diversity action before the court, so the court rejected the appellant's assertion that federal common law would apply). Of the possible approaches, however, the Eighth Circuit Court of Appeals has rejected the "lenient" approach, which requires "intentional and knowing relinquishment," but "ignores the importance of confidentiality." *See id.* at 1483 (citing *Lutheran Med. Ctr. v. Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan,* 25 F.3d 616 (8th Cir.1994), as rejecting the "lenient" approach). The Eighth Circuit Court of Appeals also would likely reject the "strict" test, under which "any document produced, either intentionally or otherwise, loses its privileged status with the possible exception of situations where all precautions were taken," because it suffers from a "pronounced lack of flexibility and . . . significant[ly] intru[des] on the attorney-client relationship." *Id.* The final possibility, and the one adopted by the Eighth Circuit Court of Appeals in a diversity case in which state law was silent, is the "middle of the road" test. *Id.; but see*

*Lutheran Med. Ctr. of Omaha,* 25 F.3d at 622 (apparently applying a "strict" test, by noting that "[d]isclosure of privileged information is inconsistent with the confidential attorney-client relationship and waives the privilege," then holding that the defendant had "destroyed the confidential status" of a letter merely by producing it with other documents) (internal quotation marks omitted), *abrogated on other grounds by Martin v. Arkansas Blue Cross & Blue Shield,* 299 F.3d 966 (8th Cir.2002), *cert. denied,* 537 U.S. 1159, 123 S.Ct. 967, 154 L.Ed.2d 893 (2003). Under that test, "the court undertakes a five-step analysis of the unintentionally disclosed document to determine the proper range of privilege to extend." *Id.* As the Eighth Circuit Court of Appeals has explained,

> These considerations are (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error.

*Gray,* 86 F.3d at 1484 (citing *Hydraflow, Inc. v. Enidine Inc.,* 145 F.R.D. 626, 637 (W.D.N.Y.1993)).

 "The exclusion of evidence on the basis of attorney-client privilege is reviewed for abuse of discretion." *Workman,* 138 F.3d at 1263.

### 3. *Application of the law*

 The court concludes that EPC has waived its attorney-client privilege as to at least some of the documents and testimony regarding communications between EPC and Mr. Held. First, Mr. Simer "expressly" waived the privilege by explaining that Mr. Held was the source of his belief that EPC had "sat on its rights" with regard to the Donaldson Informer. *See Paine-*

*Webber Group, Inc.,* 187 F.3d at 991 ("The attorney/client privilege is waived by the voluntary disclosure of privileged communications."); *Workman,* 138 F.3d at 1263 (8th Cir.1998) ("Voluntary disclosure of attorney client communications expressly waives the privilege."). EPC's assertion of "inadvertent" disclosure is simply not persuasive, even under the "lenient" approach. *See Gray,* 86 F.3d at 1483. Mr. Simer made a voluntary statement that Mr. Held was the source of his belief that EPC had "sat on its rights" *while represented by counsel in a deposition,* and counsel thereafter allowed Simer to make further disclosures without interposing an adequate objection. Such a disclosure bears no reasonable relationship to the accidental disclosure of one privileged document in a stack of a hundred or a thousand other documents. Certainly, Simer's disclosure would waive the privilege under the "strict" approach. *See id.* (disclosures, voluntary or otherwise, waive the privilege unless all precautions were taken). The disclosure also plainly waives the privilege under the "middle of the road" approach, because (1) there do not seem to have been an precautions, reasonable or otherwise, to prevent inadvertent disclosure of Mr. Held's advice concerning Donaldson's possible equitable defenses, either before Simer's deposition or in the course of the first day of that deposition; (2) the disclosures continued without intervention of counsel through the first day of Mr. Simer's deposition, (3) the disclosures thus became extensive, (4) counsel did not attempt to "close the gate" until the second day of Simer's deposition, and (5) the court finds no overriding interest of justice that would be served by relieving EPC of its error, not least because EPC has otherwise affirmatively relied on Mr. Held's advice as an explanation for failure to pursue patent enforcement actions against Donaldson sooner than 1998. *Id.* at 1484.

EPC's larger problem, in the court's view, is that EPC has "impliedly" waived the privilege by asserting advice of counsel as an explanation for its failure to assert its patent rights sooner. *See Workman*, 138 F.3d at 1263 (describing "implied" waiver by assertion of the defense of advice of counsel). Specifically, in an attempt to rebut Donaldson's laches and estoppel defenses, EPC has asserted that it was advised by counsel that pursuing a patent enforcement action against Donaldson over the Informer would not be cost effective, but that such restraint was not applicable to revised versions of the Informer. To enforce the attorney-client privilege here would allow EPC to "selectively assert privilege to block the introduction of information harmful to [EPC's] case after [EPC] introduc[ed] other aspects of [its] conversation with [counsel] to [EPC's] own benefit." *Id.* EPC cannot use the attorney-client privilege "as both a shield and a sword," and consequently, cannot claim advice of counsel as a justification for failure to sue, in its attempt to rebut Donaldson's defenses of estoppel and waiver, without permitting Donaldson to explore the substance of that advice. *Id.*

The question then becomes, what is the scope of the waiver? The documents and testimony that the court finds are sufficiently linked to Mr. Simer's voluntary disclosure that Mr. Held was the source of his belief that EPC had "sat on its rights" with regard to enforcement of its patents against Donaldson are those pertaining to *Donaldson's potential defenses of laches and estoppel. See John Morrell & Co.*, 913 F.2d at 556 (waiver only applies to documents sufficiently linked to disclosed documents). Indeed, such defenses were the topic of Mr. Simer's initial disclosure. EPC cannot unring the bell as to these issues by its subsequent reservation of a right to contest admissibility, although it does appear to the court that EPC effectively limited the waiver as to issues be-

yond the range of laches and estoppel by asserting that no broadening of any waiver was intended by any disclosures. This limitation on the scope of waiver is also appropriate for another reason: Even though the documents produced may have covered otherwise privileged communications regarding *infringement* and other issues, the court is persuaded that such documents are insufficiently related to Mr. Simer's initial waiver, and insufficiently related to a waiver as the result of EPC's "advice of counsel" arguments. *Id.* Thus, EPC's proffered "accommodation" is the starting point for determination of the scope of the waiver: The waiver is limited to communications between EPC and its prior attorney, John Held, on the subject of laches and estoppel.

Other limitations on the scope of admissible, formerly privileged documents and testimony on laches and estoppel must also be imposed, however. As the Eighth Circuit Court of Appeals explained in *Workman*, a party "cannot selectively assert privilege to block the introduction of information harmful to his case after introducing other aspects of his conversation with [counsel] to his own benefit," that is, use privilege "as both a shield and a sword." *Workman*, 138 F.3d at 1263. While this ordinarily means that a party cannot claim advice of counsel as a defense without permitting the opposing party to explore the substance of that advice, *see id.*, in the present context, it means that EPC cannot rely, for its own purposes, on documents as to which EPC may now wish to waive the privilege, but which EPC did not allow Donaldson to explore in Mr. Held's or Mr. Simer's deposition.

Turning to application of these principles, the court finds that Donaldson seeks a finding of waiver of attorney-client privilege *only as to documents from the 1996 time frame*, while EPC has expressed a

willingness to waive privilege on documents related to laches and estoppel from *both the 1984 and the 1996 time frames.* The obvious inference is that EPC sees some advantage now in disclosure of some of the documents from and testimony about EPC's communications with counsel in 1984, while Donaldson believes that it is sufficient for its purposes to present documents from and testimony about such communications in the 1996 time frame. The court finds that Donaldson was allowed to explore during Mr. Held's deposition some documents from *both* the 1984 and the 1996 time frames. Nevertheless, the court also finds that EPC's various objections during Mr. Held's deposition likely precluded as full an exploration of documents and issues related to laches and estoppel as Donaldson would have been entitled to make, had there been a contemporaneous judicial finding of waiver of attorney-client privilege. Therefore, the parties will be entitled to present documents and testimony formerly protected by attorney-client privilege *only to the extent that those issues were explored in Mr. Held's deposition.*[7]

The various motions regarding attorney-client privilege will be granted or denied, fully or in part, consistent with these conclusions.

## VI. ADMISSIBILITY OF VIDEOTAPE

 The penultimate issue before the court is raised by Donaldson's March 26, 2004, Motion In Limine To Exclude Videotape (docket no. 318). The videotape in question is a videotape on PTO practice, prepared by the Federal Judicial Center, proffered by EPC. EPC resisted the motion to exclude the videotape on April 2, 2004 (docket no. 331), and Donaldson filed a reply in support of its motion to exclude on April 7, 2004 (docket no. 337). Thus, this issue is surprisingly contentious.

Donaldson seeks to exclude the videotape, even though EPC concedes that it is not "evidence," on the ground that it would be misleading and confusing to the jury, where it contains a substantial amount of facts and law that are irrelevant and immaterial in this case, and where it fails to mention the patent defenses at issue in this case. Moreover, Donaldson points out that the patent at issue in this case was prosecuted beginning in 1978, and was issued in 1984, but the videotape was only created in 2002. Donaldson points out that the parties have submitted proposed jury instructions that would adequately inform the jury about PTO procedures and general principles of patent law. EPC, on the other hand, contends that the videotape will preclude the necessity for some "legal expert" testimony by providing the jury with a neutral explanation of PTO practice and basic principles of patent law, prepared by the Federal Judicial Center precisely for that purpose. EPC contends that there is nothing in the videotape that obscures or slants the issues in this case. In reply, Donaldson contends that EPC has provided no justification for substituting the videotape for neutral jury instructions from the Federal Circuit on patent procedures and principles or live witness

7. Indeed, the surest way to avoid expanding the scope of the waiver and to avoid allowing EPC to use the privilege as both a sword and a shield through selective waiver would be to introduce a redacted version of Mr. Held's deposition in lieu of his live testimony. Such an approach would avoid the trial becoming bogged down in arguments over whether or not certain questions properly relate to issues explored during Mr. Held's deposition—particularly where the parties' written arguments fully justify anticipation of such disputes. However, the court is unaware of any authority that would permit the court to impose such a course. Therefore, Mr. Held will be allowed to testify "live," and the deposition alternative will only be entertained if the parties reach a stipulation to that effect.

testimony on such practices and procedures. Donaldson then details several aspects in which it contends that the videotape fails to be fair and impartial, based on timing and depth (or lack thereof) with which it addresses certain issues.

The court has reviewed the copy of the videotape provided to federal courts by the Federal Judicial Center. The court concludes that the videotape would provide helpful background on principles of patent law and procedures and practices before the PTO for jurors who are likely to be largely or wholly unfamiliar with patent cases. The court is not persuaded that there is a prejudicial lack of neutrality or an obfuscation of issues in the videotape. Rather, the videotape does what it intends to do: provide useful *background* to patent disputes. Therefore, the court will deny Donaldson's motion, and will play the videotape *during jury selection* as part of the court's explanation of the background to the case. This course will, first and foremost, permit the court to explain to the jurors that the videotape is not evidence, but is intended only to provide some background to the present dispute, and to remind the jurors that they will be required to decide the case on the basis of the evidence presented and the law as explained in the court's jury instructions. It will also permit the parties to address, during voir dire, the specific issues *in this case,* thus eliminating any potential concern that the videotape either does not address those issues or does not address them fairly or in sufficient detail. The court will require the parties to submit proposed jury instructions—and if at all possible, a single stipulated instruction—advising the jury of the background use of the videotape, the fact that the videotape is not evidence, and that the jurors will be required to decide the case on the basis of the evidence presented and the law as stated in the court's instructions.

## VII. RELEASE OF SUMMARY JUDGMENT EXHIBITS

 The final issue before the court is, refreshingly, unresisted. That issue is raised in EPC's February 17, 2004, Motion To Release Two Summary Judgment Exhibits (docket no. 281). In its motion, EPC seeks release of two exhibits, marked Deposition Exhibits 65 and 68, offered into evidence by Donaldson at the September 21, 2000, *"Markman"* and summary judgment hearing. Those exhibits are two filter monitoring gauges made by EPC, and constitute samples that EPC provided to Delphi with respect to the GMT–800 program. EPC explains that these exhibits were offered in connection with EPC's trade dress claim, which has been dismissed, and EPC now desires return of the exhibits so that they may be offered into evidence in EPC's case-in-chief at trial on remaining issues. The court finds good cause for the release of the exhibits. Therefore, this motion will be granted.

## VIII. CONCLUSION

Although the court has treated the multitude of pre-trial motions "thematically" in the course of its analysis, it is now time to summarize the disposition of each specific motion, in docket number order. However, the court also deems it necessary to observe that the court has provided as prompt and thorough a review and as detailed an analysis of the parties' motions as the timing of those motions permitted. **Given the parties' demonstrated penchant for litigating—then relitigating— every conceivable issue in this case, the court anticipates a flurry of last-minute motions to clarify, reconsider, or amend the rulings on the pre-trial motions. Under the circumstances, however, with little time remaining before trial, no such motions will be entertained. The parties may reiterate objections at trial,**

should they consider it necessary to do so to preserve error for post-trial or appellate review, but the court will not allow reiteration of objections to devolve into a recrudescence of disputes over matters that are now law of the case.

THEREFORE, upon the foregoing,

1. EPC's November 21, 2003, Motion In Limine To Preclude Evidence On The Subject Of Obviousness–Type Double Patenting And Motion To Strike Supplemental Expert Reports Of James W. Miller And Jerry Lee Hall (docket no. 241) is denied, with the caveat that any evidence of obviousness-type double patenting will be submitted to the court, not to the jury. The reports and testimony of Donaldson's expert James W. Miller are admissible.

2. Donaldson's January 9, 2004, Motion To Exclude Any Reference Or Mention Of Willful Infringement At Trial (docket no. 248) is **denied**.

3. Donaldson's January 9, 2004, Motion In Limine On Admissibility of Evidence Pertaining To Plaintiff's Waived Communications With Patent Counsel (docket no. 260), as "corrected" that same day (docket no. 249), is **granted in part and denied in part**, as explained more fully herein.

4. EPC's January 9, 2004, Motion In Limine To Limit Scope Of Attorney Client Privilege Evidence (docket no. 250) is also **granted in part and denied in part**, as explained more fully herein.

5. EPC's January 9, 2004, Motion In Limine To Allow Evidence On Doctrine Of Equivalents (docket no. 251) is **granted**. EPC is not barred from attempting to prove that the NG Air Alert infringes the locking means limitations or the "disengagement means" limitation of the '456 patent under the doctrine of equivalents.

6. EPC's January 9, 2004, Motion In Limine To Preclude The Testimony Of James W. Miller (docket no. 252) is **denied**.

7. Donaldson's January 9, 2004, Motion In Limine To Exclude Unreliable Expert Opinion On Lost Profits Under Rule 702 Of The Federal Rules Of Evidence (docket no. 263) is **denied**.

8. Donaldson's February 17, 2004, Motion To Amend Answer To Add The Already Allowed Defense Of Double Patenting (docket no. 280) is **granted**.

9. EPC's February 17, 2004, Motion To Release Two Summary Judgment Exhibits (docket no. 281) is **granted**. Deposition Exhibits 65 and 68, offered in evidence by Donaldson at the September 21, 2000, "*Markman*" and summary judgment hearing, shall be released to EPC.

10. Donaldson's March 1, 2004, Motion In Limine To Exclude Any Testimony Prevented By EPC's Now Abandoned Privilege Objections (docket no. 289) is **granted**, as more fully explained herein.

11. Donaldson's March 1, 2004, Motion In Limine To Exclude Evidence Relating To The Doctrine Of Equivalents And Motion To Modify Claim Construction (docket no. 292) is **denied**.

12. EPC's March 26, 2004, Motion In Limine To Exclude The Defense Of Patent Misuse (docket no. 316) is **denied**, but evidence of "patent misuse" is limited to the two incidences of "misuse" upon which Donaldson now relies.

13. EPC's March 26, 2004, Motion In Limine To Preclude Donaldson From Presenting Any Theory Of Non–Infringement Based On Separate Patentability (docket no. 317) is **denied**.

14. Donaldson's March 26, 2004, Motion In Limine To Exclude Videotape (docket no. 318) is **denied**. The videotape will be played by the court during jury selection as background to the litigation.

The parties shall submit proposed jury instructions—and if at all possible, a single stipulated instruction—that, *inter alia*, advises the jury of the background use of the videotape, the fact that the videotape is not evidence, and that the jurors will be required to decide the case on the basis of the evidence presented and the law as stated in the court's instructions.

15. Donaldson's March 26, 2004, Motion In Limine On Admissibility Of January 20, 1998, Letter From John Held (docket no. 319) is **granted**. The court agrees with the parties that the January 20, 1998, letter is not subject to attorney-client privilege and is otherwise admissible.

16. Donaldson's March 26, 2004, Motion In Limine To Exclude Bruce Burton's March 1, 2004, Expert Report And Other Untimely Expert Disclosures (docket no. 320) is **denied**.

17. EPC's March 31, 2004, Motion To Strike Affidavit Of James F. Nieberding And To Preclude Testimony Of Any New Economic Expert (docket no. 326) is **denied**.

**IT IS SO ORDERED.**